[No. A043073. First Dist., Div. Four. June 28, 1990.]

PETER J. BULLOCK, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants
and Respondents;
ABIGAIL TENANTS ASSOCIATION et al., Interveners and
Respondents.

[Nos. A044386, A046047. First Dist., Div. Four. June 28, 1990.]

CITY AND COUNTY OF SAN FRANCISCO, Plaintiff and
Respondent, v.
PETER J. BULLOCK, Defendant and Appellant.

**COUNSEL**

Bartholomew Lee, Spiegel, Liao & Kagay and Charles M. Kagay for Plaintiff and Appellant and for Defendant and Appellant.

Louise H. Renne, City Attorney, and Kate A. Herrmann, Deputy City Attorney, for Defendants and Respondents and for Plaintiff and Respondent.

Randall M. Shaw and Stephen L. Collier for Interveners and Respondents.

**OPINION**

POCHÉ, Acting P. J.—Beginning in 1979, defendant City and County of San Francisco (the City) adopted a number of measures intended to preserve the supply of hotel units available for residential use, by limiting conversion of such units for use by tourists. Frustrated in his efforts to remove his hotel from the reach of the San Francisco Residential Hotel Unit Conversion and Demolition Ordinance (the Conversion Ordinance), plaintiff Peter J. Bullock appeals from a judgment, a preliminary injunction, and several orders in favor of the City.[1] We will affirm the judgment except to the extent it holds that plaintiff has no civil rights damage action (42 U.S.C. § 1983) against the City. We will reverse the order granting the injunction and the other orders.

## BACKGROUND

The issues raised on these appeals require that the record of salient events be summarized in some detail.

---

[1] For purposes of simplicity we refer to Mr. Bullock throughout this opinion as "plaintiff" and to the City of San Francisco and its Bureau of Building Inspection (the Bureau) as "the City." James Parodi, a former tenant of plaintiff's hotel, was originally named as a defendant in San Francisco Action No. 809721, but plaintiff later dismissed this action as to Parodi. Parodi is not a party to these appeals.

Located in central San Francisco, the Abigail Hotel was purchased by plaintiff in May of 1980 for $591,000. Plaintiff continued the previous owner's efforts to renovate the hotel, which had been condemned by the City in 1974. Plaintiff expended more than $500,000 toward this end. In November of 1980 plaintiff applied for, and the Bureau granted, a "Permit of Occupancy" authorizing "the operation of a[] hotel of 66 Rooms."[2] The permit did not specify any uses to which the rooms could or could not be devoted.

Prior to plaintiff's purchase of the hotel, the City's board of supervisors in 1979 enacted an ordinance providing (among other things) that "The conversion of any residential hotel unit into a unit intended for the primary use of tourists or other transient overnight guests or to any other use or the demolition of the unit shall be prohibited for the duration of this ordinance." Although this moratorium in its original form was to expire at the end of six months, the conversion ban was extended to May 31, 1981.

In January of 1981 the board of supervisors adopted ordinance No. 15-81, the first version of the Conversion Ordinance, whose aim was "to end the moratorium on conversion of residential hotel units and apartment units and instead regulate residential hotel unit and apartment unit conversion." Two additional measures (ord. Nos. 106-81, 330-81), also enacted in 1981, refined and amended the original ordinance.

The 1981 Ordinance (our collective designation of the three ordinances adopted in that year) constituted chapter 41 of the San Francisco Administrative Code.[3] The general provisions of the ordinance have been summarized thusly: "Its stated objective is to alleviate the 'adverse impact on the housing supply and on displaced low income, elderly and disabled persons resulting from the loss of residential hotel units through their conversion and demolition.' (Ord., § 41.2.) Findings were made by the Board in support of the ordinance: a study indicated that residential housing units in the city had decreased dramatically since 1975 due to 'vacation, conversion or demolition' of such housing; residential hotel units were declared an endangered housing resource in need of preservation. (§ 41.3.)

"The ordinance provides that owners of residential hotel units must obtain a permit from the City . . . prior to conversion of the property to any

---

[2] The Bureau issued a "Certificate of Final Completion and Occupancy" attesting to the building's compliance with state and local laws, three months before plaintiff's purchase.

[3] The 1981 Ordinance was repealed and replaced with a version of the Conversion Ordinance which became effective during the pendency of these appeals. It bears emphasis that nothing in this opinion should be understood as expressing any opinion with respect to this latest version of the Conversion Ordinance. To avoid confusion on this point, all references to provisions of the Conversion Ordinance should be understood as being to the superseded 1981 Ordinance.

other use. A permit will be granted *only* if the property owner provides relocation assistance to hotel residents and makes a 'one-for-one replacement' for the residential hotel units being converted by one of the following methods: 1) constructing the replacement units, 2) rehabilitating an equal number of residential hotel units, or 3) contributing an 'in lieu' fee to the City's Residential Hotel Preservation Fund Account in the amount of 40 percent of the construction costs of the number of units converted. [§ 41.10.]

"The ordinance defines 'residential unit' as a hotel guest room occupied by a permanent resident as of September 23, 1979; a 'permanent resident' for purposes of the ordinance is a person who occupied a hotel guest room for at least 32 consecutive days on that date. A 'residential hotel' is any building containing a 'residential unit' as of September 23, 1979. (§ 41.4.)

"Exemptions and exceptions are provided in the ordinance. It does not apply to residential hotels which had commenced substantial capital improvements or rehabilitation work prior to the effective date of the ordinance for the purpose of converting the hotel to another use; it also specifically permits a residential hotel to rent any vacant residential unit to tourists during the designated tourist season, May 1 to September 30. (§ 41.16.)

"According to the terms of the ordinance, hotel owners and operators are required to submit to the . . . Bureau . . . information on the number of units falling within the residential classification. Then, the number of units the owner is required to maintain for residential use is certified. (§ 41.6.)" (*Terminal Plaza Corp.* v. *City and County of San Francisco* (1986) 177 Cal.App.3d 892, 898-899 [223 Cal.Rptr. 379], [original italics, fn. omitted].)

In October of 1981 plaintiff filed a claim for exemption from the 1981 Ordinance on the ground that the hotel's conversion had been partially completed. A hearing officer issued a decision denying plaintiff's claim in February of 1983. The Bureau adopted this decision. Plaintiff thereupon filed a petition seeking a writ of administrative mandamus. In November of 1983 plaintiff amended his pleading to allege causes of action for (1) declaratory relief to the effect that the 1981 Ordinance on its face and as applied was "invalid . . . under the Federal and State Constitution[s] and Federal, State and local laws" in 21 particulars, and injunctive relief restraining the City from enforcing the 1981 Ordinance, (2) a taxpayer's action seeking to enjoin the City from expending money to enforce the 1981 Ordinance, (3) damages pursuant to Code of Civil Procedure section 1095, and (4) attorneys' fees pursuant to Code of Civil Procedure section 1021.5.

In April of 1984 Judge Pollak denied the petition for a writ of administrative mandamus, finding merit in none of plaintiff's complaints against the administrative decision. In November of that year the trial court issued a preliminary injunction restraining the City from enforcing those provisions of the 1981 Ordinance which prohibited plaintiff from renting or offering to rent hotel rooms for "non-residential . . . or tourist use." The court's order specified: "It is the intent of this preliminary injunction to allow plaintiff to continue to rent rooms in the ABIGAIL HOTEL to tourists which the City has designated as residential units. For plaintiff to rent such units as tourist units shall not constitute an unlawful conversion during the life of this Preliminary Injunction."

The following month, pursuant to a stipulation by the parties, the court ordered that the preliminary injunction would "remain valid and in full force and effect until entry of a final binding judgment in this action." Also in May of 1984 the Bureau issued plaintiff a "Certificate of Use" which "authorize[d] the operation of 42 residential rooms [and] 20 tourist rooms" at the hotel.

In May of 1985 leave to intervene was granted the Abigail Hotel Tenants Association and the North of Market Planning Coalition.

In September of 1985 the board of supervisors enacted an ordinance which changed the zoning classification of plaintiff's hotel and specified its inclusion within the North of Market Residential Special Use District.

In January of 1986 plaintiff filed a supplemental complaint and second amended petition which included a number of common law causes of action in addition to the entirety of his first amended petition and complaint. Nor was this all; the most notable new feature was plaintiff's addition of causes of action based upon 42 United States Code sections 1983, 1985, and 1986.

The following month Division One of this court determined that the first version of 1981 Ordinance (No. 15-81) was "illegal" because its enactment was not preceded by an environmental impact report as required by the California Environmental Quality Act. (*Terminal Plaza Corp.* v. *City and County of San Francisco, supra,* 177 Cal.App.3d 892 at pp. 902-905.) The court noted that "[t]he defect was cured, however, by reenactment of the ordinance following an environment evaluation and issuance of a negative declaration." (*Id.* at p. 905, fn. 7.)

The City moved to strike certain portions of plaintiff's latest pleading (e.g., the administrative mandamus petition already decided by Judge Pollak, and various portions relative to damages), and demurred to the rest.

Judge McCabe granted the motion to strike and sustained the demurrer, but plaintiff was granted leave to amend.

Plaintiff thereafter filed an amended supplemental complaint, this time attempting to state a single cause of action founded upon section 1983. Again the City demurred. This time Judge McCabe sustained the demurrer without granting leave to amend.

In May of 1988 motions for judgment on the pleadings were filed by both plaintiff and interveners. Accepting interveners' argument that Judge Pollak's administrative mandamus denial was res judicata as to the remainder of plaintiff's outstanding causes of action, Judge Dearman granted their motion. A judgment denying plaintiff all relief on the ground that his "complaint is barred by res judicata" was entered in due course. Among its other provisions the judgment: (1) denied plaintiff's "claim for exemption from the Residential Hotel Unit Conversion and Demolition Ordinance," (2) denied plaintiff's "challenge to the Certificate of Use," and (3) dissolved the preliminary injunction previously granted to plaintiff. Thereafter Judge Dearman made an order awarding interveners attorneys' fees of $39,477 pursuant to Code of Civil Procedure section 1021.5. Plaintiff filed timely notices of appeal from the judgment and the order.

On October 27, 1988, less than a month after plaintiff filed his notice of appeal from the attorneys' fee order, the City filed a "Complaint For Injunctive Relief And Civil Penalties." Alleging that as of August of that year plaintiff had "been renting up to 58 rooms to tourists and only 4 rooms to permanent residents," the City asked to have plaintiff's "continuing" violations of the Conversion Ordinance enjoined. The City also sought injunctive relief against plaintiff's operating "the premises as a tourist hotel" in violation of "the North of Market Residential Special Use District as set forth in City Planning Code section 249.5 and the Zoning Map of the City and County of San Francisco."[4]

In his opposition to the City's request for a temporary restraining order, plaintiff submitted a declaration in which he stated in pertinent part as follows: "I have invoked the rights afforded to me by the Ellis Act (Govt. Code [§ ] 7060 et seq.), controlling state law, which forbids the City . . . from requiring me to remain in the business of residential rentals.

---

[4] Injunctive relief was sought on the additional grounds that plaintiff's operation of the Abigail constituted a public nuisance and an unfair business practice, the latter being alleged to justify the appointment of a receiver pursuant to Business and Professions Code section 17203. These portions of the City's complaint, and its claim for civil penalties for plaintiff's violation of the City's planning code as well as Business and Professions Code section 17206, need not be summarized as they are not involved in these appeals. (But see pt. VI(D), *post*.)

"I have thus tendered to the San Francisco Residential Rent Stabilization and Arbitration Board ('Rent Board') the Ellis Act filing mandated by its Rules (on the Rent Board form Notice of Intent to Withdraw Residential Rental Units from the Rent Market) and recorded with the County Recorder my Memorandum of Notice Regarding Withdrawal of Rental Unit from Rent or Lease. . . .

"I intend to go out of the business of residential rentals entirely and in complete good faith, in reliance on my rights under state law to do so once I have made the requisite filings noted above, and I have operated the Abigail Hotel as I have in reliance on my legal and equitable right to cease renting any residential rooms and thereafter to operate entirely as a transient hotel . . . ."

The trial court denied the City's request for a temporary restraining order, but directed plaintiff to show cause why a preliminary injunction should not issue.

Plaintiff opposed the proposed injunction with a wealth of materials supporting two lines of argument. Plaintiff's first objection was based on the relative hardship of granting or denying an injunction. He produced evidence showing that he had refinanced the hotel five times, the most recent being for $1.6 million. Approximately $350,000 had been spent in litigation with the City. None of the $1,077,000 he had expended on his "capital improvement/rehabilitation work" had been recovered. At present the hotel had only four residential tenants, paying $236.92, $240, $110.04, and $111.96 per month. Based upon these statistics plaintiff stated that a preliminary injunction "will put the Hotel out of business, and lead to foreclosure and Federal Bankruptcy proceedings, because the debt service on the hotel is about $190,000 per year . . . and operation requires another $500,000 . . ., and operation as a residential hotel . . . will generate at most $312,480 a year. Even reducing expenses drastically could not make the hotel a profitable enterprise as residential . . . housing. I will be deprived of any reasonable investment backed [sic] use of my property." Plaintiff further declared that if the injunction issued "the Hotel and the restaurant in it will have to close, putting 33 people out of work, destroying two businesses, and distressing forty or more present and future Abigail Hotel guests who will be denied, or be put out of, hotel accommodations for which they have contracted and in many instances, presently occupy." Plaintiff thus submitted that the City's request should be denied because "[a] preliminary injunction is supposed to preserve, not destroy, the status quo."

The second aspect of plaintiff's presentation attacked the legal basis for the City's request for the injunction. Plaintiff reiterated that his invocation

of the Ellis Act in effect mooted the claimed violations of the Conversion Ordinance. Using the declarations of observers, plaintiff also claimed that the alleged planning code violation would not support an injunction because the October 1985 inclusion of the Abigail Hotel in the North of Market Residential Special Use District was in fact the result of an illegal and discriminatory "spot-zoning" decision made by the board of supervisors in retaliation for his litigation efforts to remove his hotel from the reach of the Conversion Ordinance.

Judge Pollak was not persuaded by these arguments and, at the conclusion of a hearing conducted on December 1, 1988, issued a preliminary injunction restraining plaintiff (among other things) from renting more than 20 rooms to tourists except during the designated tourist season.

In April of 1989, citing increasing personal, financial, and administrative difficulties, plaintiff moved for an order modifying the injunction "to allow summer tourist rental of an additional 25 hotel rooms in the Abigail Hotel."[5] Plaintiff advised the court that, in response to his administrative request to modify the provisions of the "Certificate of Use" (which had established the figure of 42 residential rooms that the City insisted on plaintiff operating) the City now took the position that because plaintiff had invoked the Ellis Act the City "would nevertheless exercise no jurisdiction to hear an appeal of the Certificate of Use." At the same time the City maintained that plaintiff still had to comply with the "one for one replacement" provision of the Conversion Ordinance. The City opposed modification on the ground that the change would contravene the Conversion Ordinance. In May Judge Pollak conducted a hearing on plaintiff's motion and made an order denying it.

Plaintiff filed timely notices of appeal from the injunction and the order denying his motion for modification.

REVIEW

We shall discuss the parties' contentions in the chronological sequence of their targets.

---

[5] Plaintiff stated in a declaration that the City had "purported to revoke" his "Ellis Act filing" the day after the preliminary injunction was issued by Judge Pollak. Thereafter plaintiff submitted a new filing and the City on April 19, 1989, provided plaintiff a "Notice of Sufficiency of AMENDED Notice of Intent to Withdraw Residential Units from the Rent Market."

*The Appeal From the Judgment*

I

Hoping to short-circuit plaintiff's arguments, the City and interveners present an elaborate contention founded on the theory that Judge Pollak's denial of plaintiff's administrative mandamus claim supported Judge Dearman's subsequent conclusion that the denial was res judicata as to the causes of action plaintiff had outstanding at the time the opposing motions for judgment on the pleadings were submitted. The heart of this argument is that Judge Pollak's ruling qualifies as a final judgment because plaintiff could have appealed from it, but failed to do so.

■ Before Judge Pollak ruled on it, plaintiff's mandamus claim had been joined in plaintiff's first amended complaint with causes of action for declaratory and injunctive relief. That joinder was clearly permissible. (See *Highland Development Co.* v. *City of Los Angeles* (1985) 170 Cal.App.3d 169, 179 [215 Cal.Rptr. 881].) It is true that denials of administrative mandamus claims have been treated as appealable final judgments within the meaning of Code of Civil Procedure section 1064, notwithstanding the fact that additional claims have not yet been resolved by the trial court. (See *id.* at pp. 178-179; *Elmore* v. *Imperial Irrigation Dist.* (1984) 159 Cal.App.3d 185, 190-192 [205 Cal.Rptr. 433]; *California Teachers Assn.* v. *Board of Education* (1980) 109 Cal.App.3d 738, 750-752 [167 Cal.Rptr. 429].) Plaintiff chose not to appeal from Judge Pollak's "Order Denying Petition And Statement Of Decision," which all parties treat as intended to be the final determination on the merits of plaintiff's mandamus claim. Judge Pollak's ruling thus qualifies as a final judgment, and one that is res judicata. (See *Hollywood Circle, Inc.* v. *Dept. of Alcoholic Beverage Control* (1961) 55 Cal.2d 728, 733 [13 Cal.Rptr. 104, 361 P.2d 712]; *Wolford* v. *Thomas* (1987) 190 Cal.App.3d 347, 357 [235 Cal.Rptr. 422]; Rest.2d Judgments, § 13, com. e.)

That judgment is, moreover, broader than may appear at first glance. In his cause of action for declaratory and injunctive relief in his first amended petition and complaint (the most current pleading at the time of Judge Pollak's ruling) plaintiff alleged as follows: "An actual controversy has arisen and now exists between Petitioner Peter J. Bullock and the respondents in that Petitioner claims that the San Francisco Residential Hotel Unit Conversion and Demolition Ordinance and Moritorium [*sic*] are invalid and do not and cannot apply to Petitioner and that Petitioner may lawfully operate his hotel business as a tourist or transient Hotel and may engage in such endeavor without first obtaining a transient hotel license, or alternatively cannot be denied such license under the subject ordinance.

Whereas Respondents contest and dispute Petitioner's contentions and maintain that the subject ordinance is in all respects valid and must be complied with by plaintiff." These allegations were incorporated in plaintiff's cause of action which he entitled "Taxpayers Suit for Injunctive Relief." Because these causes of action clearly put at issue the question of whether the Conversion Ordinance could be lawfully applied to plaintiff and his property, they should have been litigated in connection with plaintiff's administrative mandamus claim. (See *Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266, 272-273 [157 Cal.Rptr. 372, 598 P.2d 25], affd. (1980) 447 U.S. 255 [65 L.Ed.2d 106, 100 S.Ct. 2138]; *State of California* v. *Superior Court* (1974) 12 Cal.3d 237, 250-251 [115 Cal.Rptr. 497, 524 P.2d 1281]; *Taylor* v. *Swanson* (1982) 137 Cal.App.3d 416, 418 [187 Cal.Rptr. 111].) Like plaintiff's administrative mandamus claim, they too are settled as res judicata. (See *California Coastal Com.* v. *Superior Court* (1989) 210 Cal.App.3d 1488 [258 Cal.Rptr. 567]; *Takahashi* v. *Board of Education* (1988) 202 Cal.App.3d 1464, 1481-1484 [249 Cal.Rptr. 578]; *Mattson* v. *City of Costa Mesa* (1980) 106 Cal.App.3d 441, 446 [164 Cal.Rptr. 913].)

## II

Plaintiff first attacks the denial of his claim for relief in administrative mandamus because Judge Pollak applied the substantial evidence test instead of the independent judgment test.[6]

As discussed in part I, *ante*, plaintiff's failure to appeal from Judge Pollak's ruling on the administrative mandamus claim makes that ruling a final judgment. We therefore have no authority to review that ruling. (Code Civ. Proc., § 906; *Kinoshita* v. *Horio* (1986) 186 Cal.App.3d 959, 967 [231 Cal.Rptr. 241] and authorities cited.)

## III

Plaintiff next attacks Judge McCabe's order sustaining without leave the City's general demurrer to his amended supplemental complaint, because he

---

[6]This contention proceeds on the premise that plaintiff possessed a fundamental vested right to operate his hotel for exclusive tourist use. Whether or not the "Permit of Occupancy" issued by the City and plaintiff's renovation efforts establish the existence of a vested right appears to be a close question (see *Russ Bldg. Partnership* v. *City and County of San Francisco* (1988) 44 Cal.3d 839, 853-854 [244 Cal.Rptr. 682, 750 P.2d 324]; *Santa Monica Pines. Ltd.* v. *Rent Control Board* (1984) 35 Cal.3d 858, 864-867 [201 Cal.Rptr. 593, 679 P.2d 27]; *Hock Investment Co.* v. *City and County of San Francisco* (1989) 215 Cal.App.3d 438, 444-449 [263 Cal.Rptr. 665]), but it is not one which we are compelled to decide.

It should be noted that Judge Pollak's ruling was made before the provisions of the Ellis Act, discussed in part VI, *post*, became operative on July 1, 1986. We consequently express no opinion on how the Ellis Act would affect such a ruling if made after that date.

sees his pleading as adequate to state grounds for vindication of various constitutional rights pursuant to 42 United States Code section 1983 (hereafter section 1983).

Section 1983 provides in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

■ "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." (*West* v. *Atkins* (1988) 487 U.S. 42, 48 [101 L.Ed.2d 40, 48-49, 108 S.Ct. 2250, 2255].) Municipalities are within the scope of section 1983. (*Monell* v. *New York City Dept. of Social Services* (1978) 436 U.S. 658, 690 [56 L.Ed.2d 611, 635, 98 S.Ct. 2018].) Violations of state law, unless they also trench upon federal rights, are not. (See *Williams* v. *Treen* (5th Cir. 1982) 671 F.2d 892, 900.)

■ "California state courts should apply federal law to determine whether a complaint pleads a cause of action under section 1983 sufficient to survive a general demurrer." (*Greene* v. *Zank* (1984) 158 Cal.App.3d 497, 503 [204 Cal.Rptr. 770]; accord *Bach* v. *County of Butte* (1983) 147 Cal.App.3d 554, 563 [195 Cal.Rptr. 268].) According to federal law, "we are required to construe complaints under [section 1983] liberally." (*Morrison* v. *Jones* (9th Cir. 1979) 607 F.2d 1269, 1275.) "To uphold a dismissal [for failure to state a claim for relief, the federal counterpart of our general demurrer], it must appear to a certainty that the plaintiff would not be entitled to relief under any set of facts that could be proved." (*King* v. *Atiyeh* (9th Cir. 1987) 814 F.2d 565, 567.) In line with California practice, federal law requires that the factual allegations of the complaint be accepted as true. (*Hall* v. *City of Santa Barbara* (9th Cir. 1986) 797 F.2d 1493, 1496, fn. 9.) Unlike California, federal courts reviewing a dismissed section 1983 claim look to the entire record assembled in the trial court. (See *Manning* v. *Lockhart* (8th Cir. 1980) 623 F.2d 536, 538; *Hurney* v. *Carver* (1st Cir. 1979) 602 F.2d 993, 996.)

The cause of action that plaintiff attempted to plead appears in his first amended complaint and his amended supplemental complaint. The matters for which he seeks damages pursuant to section 1983 may be grouped into two classifications.

■ The first grouping comprises the substantive flaws plaintiff purports to detect on the face of the Conversion Ordinance.[7] Insofar as they involve federal rights made actionable by section 1983, these flaws include plaintiff's charges that the ordinance effects a taking of his property without compensation; is vague and ambiguous; interferes with interstate commerce; violates the Sherman Antitrust Act; deprives him of equal protection; and that he "has been denied due process of law in the enactment . . . of the Ordinance." In California there is an extensive body of precedent rejecting such claims and displaying a generally tolerant attitude to municipal ordinances in this area. (See *Griffin Development Co.* v. *City of Oxnard* (1985) 39 Cal.3d 256, 262-267 [217 Cal.Rptr. 1, 703 P.2d 339]; *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 679-704 [209 Cal.Rptr. 682, 693 P.2d 261], affd. (1986) 475 U.S. 260 [89 L.Ed.2d 206, 106 S.Ct. 1045]; *Nash* v. *City of Santa Monica* (1984) 37 Cal.3d 97, 102-109 [207 Cal.Rptr. 285, 688 P.2d 894], app. dism. (1985) 470 U.S. 1046 [84 L.Ed.2d 807, 105 S.Ct. 1740]; *Agins* v. *City of Tiburon, supra*, 24 Cal.3d 266; *Terminal Plaza Corp.* v. *City and County of San Francisco, supra*, 177 Cal.App.3d 892 at pp. 907-912; see also *Pennell* v. *City of San Jose* (1986) 42 Cal.3d 365 [228 Cal.Rptr. 726, 721 P.2d 1111], affd. (1988) 485 U.S. 1 [99 L.Ed.2d 1, 108 S.Ct. 849]; *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129 [130 Cal.Rptr. 465, 550 P.2d 1001]; cf. Gov. Code, § 65590; *McHugh* v. *Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348 [261 Cal.Rptr. 318, 777 P.2d 91].) We are obliged to conform to these constructions of federal constitutional requirements. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) If a change is to be made, it must come from a higher court.

The second grouping of plaintiff's complaint deals not with the substance of the conversion ordinances, but with the means and practices attending their administration. The specifics are retaliation, biased tribunals evidencing a denial of procedural due process, and unequal application. Each of these points will be considered in turn.

The most egregious of the instances of retaliation alleged by plaintiff concerns the so-called "spot-zoning" of his property. The City established the North of Market Residential Special Use District in March of 1985.[8] This enactment occurred during the period when plaintiff was challenging the constitutionality of the 1981 Ordinance and was protected by the in-

---

[7] The following analysis does not pertain to plaintiff's claims that the Conversion Ordinance is unconstitutional as applied to him, because those claims are to be deemed resolved adversely to plaintiff in the final administrative mandamus judgment which cannot be reviewed on these appeals. (See pt. II, *ante*.)

[8] The purposes for establishing the district are generally similar to those of the Conversion and Demolition Ordinances. (See S.F. Planning Code, § 249.5, subd. (b).)

junction restraining the City from applying that ordinance to plaintiff. Plaintiff's hotel was not within the original boundaries of the district. In September of 1985 the board of supervisors was considering an ordinance whose sole effect would be to amend the zoning map of the district to include plaintiff's hotel. One of the supervisors questioned the merits of this action as "spot-zoning" and discriminatory, and also because another hotel located one block away was not included. In response to a question from the supervisor whether there was any pending litigation regarding plaintiff's hotel, a deputy city attorney stated: "There is a suit against the City and it would be in the best interests of the City if the Abigail Hotel be rezoned to residential as there is a chance that the Abigail might win the suit based upon the Courts' interpretation of the Ordinance's constitutionality." The rezoning ordinance was then adopted by a divided vote.[9] Plaintiff alleged that this action was "retaliatory" and violated his constitutional rights "by making him an individual target of a municipal ordinance to punish him for the exercise of his First Amendment rights."

■ "The right of access to the courts is subsumed under the first amendment right to petition the government for redress of grievances. [Citations.] Deliberate retaliation by state actors against an individual's exercise of this right is actionable under section 1983." (*Soranno's Gasco, Inc.* v. *Morgan* (9th Cir. 1989) 874 F.2d 1310, 1314.) Because we must assume the truth of plaintiff's allegation that the rezoning was retaliatory (see *Hall* v. *City of Santa Barbara, supra,* 797 F.2d 1493 at p. 1496, fn. 9), this portion alone will save plaintiff's cause of action.

Such a firm conclusion cannot so easily be extended to the other retaliatory particulars cited by plaintiff. Plaintiff further alleged that "in retaliation for his exercise of his First Amendment rights" (presumably the litigation mentioned above), the City (1) "applied a policy of recommendation of landlords for criminal prosecution to plaintiff, first by giving plaintiff erroneous advice upon which he relied, and then having him prosecuted and convicted of criminal contempt to make an example of him," and (2) "refuses to do its ministerial duty to remove liens against the ABIGAIL HOTEL for satisfied obligations in connection with various Code inspections." A violation of section 1983 does not occur if municipal action is merely vigorous or overzealous law enforcement. (See *Chalfy* v. *Turoff* (2d Cir. 1986) 804 F.2d 20, 22-23.) On the other hand, if the conduct is unjustified harassment it becomes actionable. (See *id.* at p. 21; *Espanola Way Corp.* v. *Meyerson* (11th Cir. 1982) 690 F.2d 827, 829.) Even under the

---

[9] The record on appeal also includes two declarations by former supervisors who were present at the time. These declarations have not figured in our analysis because they were not produced before the trial court, but their substance only replicates material which the trial court did have in front of it.

more relaxed federal standards of notice pleading, these allegations are striking for the absence of factual specifics (e.g., What was the "erroneous advice" given to plaintiff? Who gave it to him? When was it given to him? When should the City have done "its ministerial duty to remove liens"? Did plaintiff request that these liens be removed? If he did, when did he do so? Did the City refuse? Were the liens ever removed?) There is nothing in the record which augments these naked allegations. Nevertheless, plaintiff should be afforded at least one more opportunity to supply the requisite details before a court can state "it . . . appear[s] to a certainty that the plaintiff would not be entitled to relief under any set of facts that could be proved." (*King* v. *Atiyeh, supra*, 814 F.2d 565 at p. 567.) In light of plaintiff's ability to substantiate his claim of retaliation in the City's "spot-zoning" decision, his additional allegations of retaliation do not appear totally fanciful as a matter of law.

■ "[A] 'fair trial in a fair tribunal is a basic requirement of due process.' [Citation.] This applies to administrative agencies which adjudicate as well as to courts. [Citation.] Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.' " (*Withrow* v. *Larkin* (1975) 421 U.S. 35, 46-47 [43 L.Ed.2d 712, 723, 95 S.Ct. 1456].) The Ninth Circuit has described "the assurance of a central fairness" at administrative hearings as "[t]he key component of due process." (*Vanelli* v. *Reynolds School Dist. No. 7* (9th Cir. 1982) 667 F.2d 773, 779.) "[A] deprivation of procedural due process is an independent constitutional tort, actionable under § 1983 with or without proof of actual injury." (*Burt* v. *Abel* (4th Cir. 1978) 585 F.2d 613, 616.)

With respect to the administrative agency responsible for the Conversion Ordinance plaintiff alleged as follows: "As its custom and policy . . . [the agency] established and employed a biased and unqualified corps of arbitrators (called Hearing Officers) some of whom were tenants' rights activists and dominant among whom were a group of [agency] staff ideologically committed to tenants' interests at the expense of landlords who appeared before the [agency]"; that the agency staff "made and implemented against landlords . . . a policy that in adjudications between tenants and landlords, the tenants should win, and . . . which policy included imposition, without notice, of retroactive monetary sanctions upon landlords who sought to exercise their rights under the said Ordinances"; and that as a consequence of the agency having "established and continued inadequate procedures and facilities for its hearings and appeals" the agency "denied appellate rights to landlords (who lost 90% of the adjudications and 75% of the appeals) . . . by establishing and continuing a policy of making inadequate, erroneous and incomplete records of adjudicatory proceedings by electronic means

(tape recorders)[10] . . . all the while holding out to the public the appearance of adequacy of the recordings."

Any deficiencies on the face of the pleading in this regard are more than remedied by the entire record produced before Judge McCabe. That record shows that between 1982 and 1986 plaintiff commenced numerous actions in the trial court involving challenges to the agency's procedures and decisions. The record also includes a 1985 final judgment of the trial court criticizing the agency's "[p]rocedures for safeguarding transcripts" and noting that "about 90% of the petitions before the [agency] result in a decision in favor of tenants" which "raises a strong and very uncomfortable suspicion of bias in favor of tenants" (Hozz v. City & County of San Francisco (Super. Ct. S. F. City & County, No. 817495)); a declaration of the agency's former president attesting to a pervasive antilandlord bias among agency staff and hearing officers; testimony by the same official to the same effect in a federal district court trial (*Campbell* v. *City & County of San Francisco et al.* (N.D. Cal. 1986) No. C 80-4463 MHP); testimony by a former hearing officer in the same trial also detailing antilandlord bias among agency staff; and an order made during the course of that federal action denying the City's motion for summary judgment, the district court finding triable issues of fact concerning the impartiality of the hearing officers and the substantially identical hearing and appeal procedural defects alleged by plaintiff.[11] The totality of plaintiff's allegations and the record cure any possible insufficiency of his complaint.

■ Finally, there is the claimed denial of equal protection of the laws. Plaintiff alleged that the City's treatment of his application for a permit to operate his hotel for exclusively tourist use denied him equal protection "in that he was treated differently than other hotel owners similarly situated." Once again, this is an allegation bereft of factual underpinnings establishing disparate treatment. There is nothing in either the complaint or the record which shows how other property owners similarly situated were dealt with differently than plaintiff. Of all plaintiff's claims this one comes closest to being an appropriate target for a general demurrer. Two factors counsel otherwise. The first is plaintiff's allegation that the City "proceeded to deny

---

[10] We note in passing, and without it constituting any part of our analysis, that we recently reversed a judgment dismissing one of the actions filed by plaintiff against the City for this very reason. (*Bullock* v. *San Francisco Rent Stabilization & Arbitration Bd.* (Apr. 30, 1990) A044385 [nonpub. opn.].) We further note that Division One of this court has criticized the procedures of the City's designated administrative agency and intimated that an agency decision "was based in part on passion or prejudice." (*Campbell* v. *Residential Rent Stabilization & Arbitration Bd.* (1983) 142 Cal.App.3d 123, 129-130 [text & fn. 3] [190 Cal.Rptr. 829].)

[11] The district court took judicial notice of the Hozz decision and made reference to the comments of the Court of Appeal in *Campbell* v. *Residential Rent Stabilization & Arbitration Bd., supra,* 142 Cal.App.3d 123, cited at footnote 10, *ante.*

*specifically to plaintiff* . . . fair treatment" (italics added), which raises the possibility that the treatment he received from the City with respect to his request for a permit to operate a tourist hotel was simply another form of retaliation or harassment that went beyond acceptable enforcement of the Conversion Ordinance. (See *Chalfy* v. *Turoff, supra*, 804 F.2d 20 at p. 21; *Espanola Way Corp.* v. *Meyerson, supra*, 690 F.2d 827 at p. 829.) The second is that plaintiff may be able to substantiate how other hotels were accorded more lenient treatment. In either event, plaintiff should be granted leave to amend his complaint in order that these possibilities may be settled.

In many respects plaintiff's complaint is long on conclusionary allegations but woefully short of the requisite factual allegations. Other materials produced before the trial court are, however, more than adequate to remedy the deficiencies of the actual complaint. (See *Manning* v. *Lockhart, supra*, 623 F.2d 536 at p. 538; *Hurney* v. *Carver, supra*, 602 F.2d 993 at p. 996.) Accordingly, we conclude that it was error to sustain the City's general demurrer without granting leave to amend.

## IV

Plaintiff has two objections to Judge Dearman's rulings on the opposing motions for judgment on the pleadings made by interveners and himself. Plaintiff argues in effect that the correct rulings were made on the wrong motions—interveners' motion should have been denied and his motion should have been granted.

The first part of plaintiff's contention must be rejected for the reasons stated in part I, *ante*; as matters stood at the time he had to rule on interveners' motion, Judge Dearman was correct in granting it. For the reasons stated in part III, plaintiff's claim for damages pursuant to 42 United States Code section 1983 must be counted among those causes of action which were still outstanding at the time the motions for judgment on the pleadings were made. Because a motion for judgment on the pleadings is the functional equivalent of a general demurrer (see *Nunn* v. *State of California* (1984) 35 Cal.3d 616, 620-621 [200 Cal.Rptr. 440, 677 P.2d 846]), because plaintiff's section 1983 cause of action has been held sufficient to withstand the general demurrer interposed by the City, and because that cause of action was never addressed as part of interveners' motion, the judgment based upon the granting of that motion must be reversed in part.

The same reasoning requires that the second part of plaintiff's contention must be rejected. It is fundamentally unfair to fault a trial court for a reason it never had an opportunity to consider. In light of the fact that the City's demurrer to plaintiff's cause of action based on section 1983 had been

sustained, Judge Dearman was completely justified in not considering that cause of action in connection with the opposing motions for judgment on the pleadings. Accordingly, it was not reversible error to deny plaintiff's motion.

## V

■ The attack pressed by plaintiff on the attorneys' fee award made by Judge Dearman pursuant to Code of Civil Procedure section 1021.5 need not detain us long. That statute provides in pertinent part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. . . ." It is a fair reading of the statutory language regarding "a successful party" and "any action which has resulted" that an award of attorneys' fees pursuant to this statute is premature if the action is still unresolved. Our reversal of the judgment puts much of plaintiff's action at large again. Because the judgment must be reversed, so must the award order.

*The Appeal From the Injunction*

## VI

■ Ordinarily, a party challenging the grant of a preliminary injunction must demonstrate that the trial court abused its discretion in evaluating the interrelated factors of (1) "the likelihood that the plaintiff will prevail on the merits at trial," and (2) "the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued." (*IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69-70 [196 Cal.Rptr. 715, 672 P.2d 121]; accord *King* v. *Meese* (1987) 43 Cal.3d 1217, 1226 [240 Cal.Rptr. 829, 743 P.2d 889]; *Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 286 [219 Cal.Rptr. 467, 707 P.2d 840].) In the case at hand, however, plaintiff, claiming that his entitlement under the Ellis Act to withdraw from the residential rental market is absolute and dispositive of all issues, invokes the principle that "when the matter is solely a question of a violation of law the standard of review is not abuse of discretion but whether statutory or constitutional law was correctly interpreted and applied by the trial court." (*California Assn. of Dispensing Opticians* v. *Pearle Vision Center, Inc.* (1983) 143 Cal.App.3d 419, 426 [191 Cal.Rptr. 762].)

Justice Ashby recently explained this principle in these terms: "Occasionally, however, the likelihood of prevailing on the merits depends upon a question of pure law rather than upon evidence to be introduced at a subsequent full trial. . . . If such a question of pure law is presented, it can sometimes be determinative over the other factor, for example, when the defendant shows that the plaintiff's interpretation is wrong as a matter of law and thus the plaintiff has no possibility of success on the merits." (*Hunter* v. *City of Whittier* (1989) 209 Cal.App.3d 588, 595-596 [257 Cal.Rptr. 559].)

As we shall explain, the Ellis Act does provide the dispositive rule of decision. We agree with plaintiff that, having properly invoked the Ellis Act, he is entitled to quit the business of providing residential rental units as that term is used in the Ellis Act. We further agree with plaintiff that the Ellis Act preempts a crucial provision of the Conversion Ordinance. These questions of pure law concerning the Ellis Act are probably sufficient by themselves to require reversal of the orders granting the preliminary injunction and denying plaintiff's motion to modify the injunction. Nevertheless, out of an abundance of caution we shall also conclude that the orders cannot be upheld according to the traditional "interim harm" and "likelihood of prevailing on the merits" factors.[12] Finally, for the guidance of the trial court in the event the City renews its application for injunctive relief, and because it is implicated by our discussion in part III, *ante*, we address the alternative ground of the City's original application—the zoning restriction of the North of Market Residential Special Use District.

### (A)

Plaintiff having provided the formal notification which the Ellis Act authorizes a public entity to demand (see Gov. Code, § 7060.4), and the City, having apparently accepted plaintiff's notification,[13] are at one in their willingness to have the soundness of the injunction adjudicated on the basis of the Ellis Act. Their mutual premise is that the statutes comprising the Ellis Act[14] apply to plaintiff's situation.

A little background is helpful here. In *Nash* v. *City of Santa Monica, supra*, 37 Cal.3d 97, our Supreme Court rejected the contention that a

---

[12] Our caution derives from *Cohen* v. *Board of Supervisors, supra*, 40 Cal.3d 277, where the Supreme Court held a municipal ordinance preempted by state law, but nevertheless remanded the case to the Court of Appeal for consideration of the traditional factors in light of the Supreme Court's decision on the purely legal issue of preemption. (*Id.* at pp. 289-290, 304.)

[13] As previously mentioned, the City revoked its acceptance of plaintiff's "Ellis Act filing" the day after issuance of the preliminary injunction, but the City accepted a subsequent filing by plaintiff before he moved to have the injunction modified. (See fn. 5 and accompanying text, *ante*.) The City will consequently be deemed to have been on notice at all relevant times that plaintiff was invoking the Ellis Act.

[14] The Ellis Act appears as sections 7060-7060.7 comprising chapter 12.75 ("Residential Real Property") of the Government Code.

municipal rent control ordinance prevented a landlord from going out of the business of renting apartments. The Legislature, under the apparent impression that the *Nash* court had denied the existence of a " 'fundamental right' to cease doing business as a landlord" (*id.* at pp. 103-108), passed the Ellis Act to alleviate the plight of landlords. The Legislature codified its "intent . . . in enacting this chapter to supersede any holding or portion of any holding in Nash v. City of Santa Monica, 37 Cal.3d 97 to the extent that the holding, or portion of the holding, conflicts with this chapter, so as to permit landlords to go out of business." (Gov. Code, § 7060.7.) The core of the Ellis Act is this prohibition: "No public entity . . . shall, by statute, ordinance, or regulation, or by administrative action implementing any statute, ordinance, or regulation, compel the owner of any residential real property to offer, or to continue to offer, accommodations in the property for rent or lease." (Gov. Code, § 7060, subd. (a).)[15]

The Ellis Act is pegged to "residential real property," a term that is not accompanied by a statutory definition. Of course, the meaning of "real property" is ancient, fixed, and undisputed. (See Civ. Code, §§ 14, 658.) Our difficulty comes with "residential," whose root is "residence." A quartet of statutory construction principles guides our inquiry.

■ First, "[i]t is a paramount canon of statutory construction that statutes should be given effect according to the usual and ordinary import of the words used in the statute." (*Guedalia* v. *Superior Court* (1989) 211 Cal.App.3d 1156, 1160 [260 Cal.Rptr. 99].) ■ Second, the Legislature is presumed to have been aware of existing judicial and statutory constructions of terms, and to have adopted those meanings in framing subsequent statutes. (*People* v. *Weidert* (1985) 39 Cal.3d 836, 844-846 [218 Cal.Rptr. 57, 705 P.2d 380].) ■ Third, we look to other provisions of the Ellis Act because " 'the court should construe a statute with reference to the whole system of law of which it is a part.' " (*State of California* ex rel. *Dept. of Transportation* v. *Superior Court* (1985) 37 Cal.3d 847, 858 [210 Cal.Rptr. 219, 693 P.2d 804] [citing and quoting *People* v. *Ruster* (1976) 16 Cal.3d 690, 696 [129 Cal.Rptr. 153, 548 P.2d 353, 80 A.L.R.3d 1269]].) ■ Finally, because the Ellis Act was passed in response to *Nash*, it is acceptable to construe the former with reference to the latter in order to effectuate the Legislature's professed intent to supersede *Nash*. (See *Walters* v. *Weed* (1988) 45 Cal.3d 1, 9-10 [246 Cal.Rptr. 5, 752 P.2d 443]; *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) Application of these principles provides meaning to the phrase "residential real property," as used in the Ellis Act.

---

[15] The Ellis Act defines "accommodations" to mean "residential rental units." (Gov. Code, § 7060, subd. (b).)

■ It is generally accepted that " 'residence' connotes any factual place of abode of some permanency, more than a mere temporary sojourn." (*Smith* v. *Smith* (1955) 45 Cal.2d 235, 239 [288 P.2d 497]; accord *Vanguard Ins. Co.* v. *Hartford Ins. Co.* (1970) 9 Cal.App.3d 765, 768 [88 Cal.Rptr. 628]; *Whittell* v. *Franchise Tax Board* (1964) 231 Cal.App.2d 278, 284 [41 Cal.Rptr. 673]; *Younger* v. *Spreckels* (1909) 12 Cal.App. 175, 177-178 [106 P. 895].) Government Code section 244, subdivision (a) codifies a similar definition of residence as "the place where one remains when not called elsewhere for labor or other special or temporary purpose, and to which he or she returns in seasons of repose." (Cf. Rev. & Tax. Code, § 17014, subd. (a).) Significantly, "[o]ne who is merely stopping over at a place in a hotel, motel, rooming house, or who is vacationing is not a resident." (*Enter* v. *Crutcher* (1958) 159 Cal.App.2d Supp. 841, 845 [323 P.2d 586].) Such a temporary sojourner is a mere lodger, whose possessory rights and interests are vastly inferior to those of a tenant. (See *Stowe* v. *Fritzie Hotels, Inc.* (1955) 44 Cal.2d 416, 421 [282 P.2d 890]; *People* v. *Minervini* (1971) 20 Cal.App.3d 832, 840 [98 Cal.Rptr. 107]; *Green* v. *Watson* (1964) 224 Cal.App.2d 184, 190 [36 Cal.Rptr. 362]; *Roberts* v. *Casey* (1939) 36 Cal.App.2d Supp. 767, 771 [93 P.2d 654].) The matter of status is significant because it figures prominently in the Ellis Act.

■ The Ellis Act is consistent in how it characterizes the relationship between the owner and the occupant of "residential real property." Without exception, that relationship is described as resting upon a "for rent or lease" basis. (See Gov. Code, §§ 7060, subd. (a), 7060.1, subds. (a), (c)(1), 7060.2, subds. (a), (b), (c), 7060.4, subd. (a), 7060.7, subd. (4).) The point is reiterated by repeated mention of the occupant as a "tenant or lessee." (See Gov. Code, §§ 7060.2, subds. (a), (b), 7060.4, subds. (a), (b), 7060.6; see also § 7060.7, subd. (2) ["tenants"].) There is also varying terminology such as "residential rental units" (Gov. Code, §§ 7060, subd. (b)(1), 7060.4, subd. (a)) and "accommodations . . . offered . . . for residential purposes" (Gov. Code, § 7060.2, subd. (a)) which at the very least demonstrates an emphasis on habitations not of a temporary nature. More specifically, the whole tenor of the Ellis Act demonstrates that the Legislature did not intend its handiwork to encompass owners of hotels offering accommodations to lodgers. This can be seen most clearly by example.

Let us assume that some vacationers from Des Moines are prevented by a hotel owner from occupying hotel rooms for the full period they thought had been reserved by their travel agent. The Ellis Act empowers local government to provide that if accommodations are withdrawn from a market, and "[i]f the accommodations are offered again for rent or lease for residential purposes within one year of the date the accommodations were withdrawn from rent or lease," the owner can be required to "first offer the

unit for rent or lease to the tenant or lessee displaced from that unit by the withdrawal . . . ." (Gov. Code, § 7060.2, subd. (a)(4).) Given the unlikelihood of the owner locating our hypothetical Hawkeyes and their being interested in resuming their interrupted stay, this provision can only have been intended to apply to persons who would be interested in an occupancy for a duration not quite so transitory. Violation of this provision may subject the "owner of the accommodations" to damages in an amount "not [to] exceed the contract rent for six months for any unit or units from which a tenant or lessee was displaced by withdrawal of the unit from rent or lease . . . ." (*Id.*, subds. (a)(2), (a)(3).) The obvious predicate is a tenancy whose length is intended by the parties to be measured by the month. The number of tourists who would have such an intent would be minimal; the number of "residents" would not.

The Ellis Act includes multiple mention of, and allowance made for, municipal rent control. (See Gov. Code, §§ 7060.2, 7060.4, 7060.7, subd. (4).) It also integrates its provisions with those governing unlawful detainer proceedings. (Gov. Code, § 7060.6.) It is unlikely that rent control would apply to the hotel room occupied by our tourists from Des Moines. It is highly improbable that such persons would so overstay their welcome as to require their innkeeper to resort to an unlawful detainer ouster. On the other hand, the presence of occupants whose stay has been sufficiently prolonged to qualify them as residents makes the references to rent control perfectly comprehensible. Unlike lodgers, such persons would have cause to be thankful for the provision granting them the right in unlawful detainer proceedings to "assert by way of defense that the owner has not complied with the applicable provisions" of the Ellis Act. (*Ibid.*)

There is also proof that the special nature of residential hotels was recognized by the Legislature. It declared that nothing in the Ellis Act "[d]iminishes or enhances any power which currently exists or which may hereafter exist in any public entity to mitigate any adverse impact on persons displaced by reason of the withdrawal from rent or lease of any accommodation in any residential hotel, as defined by Section 50519 of the Health and Safety Code . . . ." (Gov. Code, § 7060.1, subd. (c)(1).) At the time the Ellis Act was enacted the definition of "residential hotel" it incorporated meant "any building containing six or more guestrooms intended or designed to be used, or which are used, rented, or hired out, to be occupied, or which are occupied, for sleeping purposes by guests, which is also the primary residence of such guests, but *does not mean any hotel which is primarily used by transient guests who do not occupy such hotel as their primary residence.*" (Former Health & Saf. Code, § 50519, subd. (b)(1),

italics added.)[16] Use of the term "residential hotel" thus clearly excludes persons in the position of our Iowa tourists, who would not have a tenancy created by a relationship founded upon a "rent or lease" basis, and whose occupancy would not qualify "as their primary residence."

The net effect of these provisions of the Ellis Act strongly suggests that the Legislature's use of the phrase "residential real property" is, and was intended to be, consistent with the ordinary and established meaning of "resident," that is, as referring to an occupancy not of a temporary or transitory nature. We concur with the court which conducted a painstaking examination of the Ellis Act and concluded that it was intended to benefit owners of accommodations subject to rent control. (See *City of Santa Monica* v. *Yarmark* (1988) 203 Cal.App.3d 153, 165-168 [249 Cal.Rptr. 732].) It is clear that plaintiff desires to cease renting units in his "residential hotel" as that term is defined in the Conversion Ordinance, and to cease participation in the "residential hotel" business as that term is defined in the Ellis Act by incorporation. The Ellis Act authorizes property owners in the business of offering "residential rental units" for rent or lease to "go out of [that] business." (Gov. Code, §§ 7060, 7060.7.) Accordingly, plaintiff's plan to go out of the residential hotel business is protected by the Ellis Act.

### (B)

One of the key provisions of the Conversion Ordinance is section 41.10, the "one-for-one replacement" provision. It conditions issuance of a permit to convert residential hotel units on the owner either furnishing comparable units in the same quantity as the units converted, or making a substantial "in lieu" payment to a fund maintained by the City.[17] The City seems

---

[16] This definition was recently amended in particulars which do not affect its quoted substance. (See Stats. 1989, ch. 184, No. 5 West's Cal. Legis. Service, p. 1024, No. 3 Deering's Adv. Legis Service, p. 707.)

[17] Section 41.10 of the San Francisco Administrative Code provides in pertinent part:

"ONE-FOR-ONE REPLACEMENT. (a) Prior to the issuance of a permit to convert, the owner or operator shall provide for one-for-one replacement of the units to be converted by one of the following methods:

"(1) Construct or cause to be constructed a substantially comparable-sized unit to be made available at comparable rent to replace each of the units to be converted; or

"(2) Cause to be brought back into the housing market a comparable unit from any building which was not subject to the provisions of this Chapter [i.e., the Conversion Ordinance] to be offered at comparable rent to replace each unit to be converted; or

"(3) Construct or cause to be constructed or rehabilitated apartment units for elderly, disabled or low-income persons or households at a ratio of less than one-for-one to be determined by the City Planning Commission . . . .

"(4) Pay to the City . . . an amount equal to 40 percent of the cost of construction of an equal number of comparable units plus site acquisition cost. All such payments shall go into

willing to have plaintiff quit the residential hotel business, but not until he complies with section 41.10. Viewing section 41.10 as nothing less than a codified form of extortion, plaintiff submits that requiring compliance is forbidden by the Ellis Act, which he views as granting him the absolute right to go out of the residential hotel business and into the tourist hotel business.

The only precedents discussing the preemptive effect of the Ellis Act involved provisions of a rent control ordinance enacted by the City of Santa Monica. That ordinance forbade landlords renting units subject to rent control from receiving a permit to remove the units from the rental market unless the landlord could not make a fair return on the units, or unless the landlord promised to develop new units subject to rent control, with a certain percentage priced so as to be affordable by persons of low income. Separate courts in *City of Santa Monica* v. *Yarmark, supra,* 203 Cal.App.3d 153, and *Javidzad* v. *City of Santa Monica* (1988) 204 Cal.App.3d 524 [251 Cal.Rptr. 350], held that these provisions were preempted by the Ellis Act. The court in *Yarmark* held that one of the primary objectives of the Ellis Act "is to prevent public entities from acting in a manner inconsistent with the Act such as to prevent landlords from withdrawing units . . . so they may go out of business." (*City of Santa Monica* v. *Yarmark, supra,* at p. 166.) The court in *Javidzad* was particularly emphatic in rejecting Santa Monica's claim that a demolition permit could be denied until the landlord had secured a removal permit conditioned on compliance with the statutory terms mentioned above. The ordinance was held to be preempted "because it impermissibly conditions the landlord's right to go out of business on compliance with requirements not found in the [Ellis] Act. [¶] . . . Denying a . . . removal permit to a landlord who has gone out of the rental housing business imposes a prohibitive price on the exercise of the right under the Act." (*Javidzad* v. *City of Santa Monica, supra,* 204 Cal.App.3d at pp. 530-531.)

■ There is no principled basis on which to distinguish section 41.10 from these holdings. Plaintiff has, in no uncertain terms and in accordance with the procedures established by the City, advised the City of his intent to depart the business of renting residential hotel units. (See fns. 5, 12, and

a San Francisco Residential Hotel Preservation Fund Account. The Department of Real Estate shall determine this amount based upon two independent appraisals. . . ."

Section 41.10 was reenacted as section 41.13 of the current Conversion Ordinance. (See fn. 3, *ante.*) The new version increased the in lieu payment to 80 percent of replacement and site acquisition costs. The manner in which we resolve these appeals does not require us to do more than mention this latest version of the Conversion Ordinance. For purposes of simplicity, and because plaintiff's attack is so specifically focused on the 1981 Ordinance, we shall forego using the technically correct modifier "former" concerning section 41.10, and treat it as if it still existed.

accompanying text, *ante*.) The Ellis Act does not permit the City to condition plaintiff's departure upon the payment of ransom. What was said with respect to the Santa Monica ordinance is equally applicable to section 41.10: " 'The plain effect of this . . . provision is to compel the landlord to remain in the rental business at that particular location since it allows no means to permit the landlord to just simply go out of that business. By contrast, the Ellis Act contains no such limitations.' " (*Javidzad* v. *City of Santa Monica, supra*, 204 Cal.App.3d 524 at p. 528.) Rather than recognize the right of plaintiff given by the Ellis Act " 'to just simply go out of . . . business,' " the City is attempting to "impose[] a prohibitive price on the exercise of th[at] right under the Act." (See *id*. at pp. 528, 531.)

The City attempts to save section 41.10 by arguing that it merely mitigates the adverse impact on the persons who will be displaced by plaintiff's conversion, a power expressly reserved to the City by the Ellis Act.[18] The Conversion Ordinance makes provision for relocation assistance to tenants displaced by a conversion,[19] and the uncontradicted evidence in the record is that plaintiff advised the trial court of his willingness to comply with this requirement. It is one thing to require the owner of a residential hotel to provide mitigation to tenants actually displaced by a conversion (see Gov. Code, § 7060.1, quoted at fn. 18, *ante*), but it is something entirely different to require the owner to make expenditures that benefit society at large. (See *McKeon* v. *Hastings College* (1986) 185 Cal.App.3d 877, 896-899 [230 Cal.Rptr. 176].) To allow the City to so enlarge the concept of mitigation that it prevents plaintiff from exercising his right to go out of business would make the Ellis Act a dead letter except for those owners fortunate enough to have no tenants to displace. This too is "a prohibitive price on the exercise of [plaintiff's] right under the Act." (*Javidzad* v. *City of Santa Monica, supra*, 204 Cal.App.3d 524 at p. 531.) In short what the City demands cannot fairly be construed to fit within the Ellis Act's exception for mitigation of "any adverse impact on persons displaced . . . ." (Gov. Code, § 7060.1, subd. (c)(1).)

[18] "Notwithstanding Section 7060, nothing in this chapter does any of the following: [¶] . . . (c)(1) Diminishes or enhances any power which currently exists or which may hereafter exist in any public entity to mitigate any adverse impact on persons displaced by reason of the withdrawal from rent or lease of any accommodations in any residential hotel. . . ." (Gov. Code, § 7060.1.)

[19] ". . . (b) Relocation Assistance. [¶] (1) A permanent resident, who as a result of the conversion of his/her unit must relocate off site, shall be reimbursed the actual moving expenses not to exceed $300 or may consent to be moved by the owner or operator; [¶] (2) A displaced permanent resident shall have the right of first refusal for the rental or leasing of replacement units, if any, provided pursuant to the provisions of Section 41.10(a)(1) or 41.10(a)(2) [quoted at note 17, *ante*]; [¶] (3) A permanent resident displaced by a partially completed conversion . . . shall be entitled to a displacement allowance of $1,000 per displaced person." (S.F. City Admin. Code, § 41.14.)

What plaintiff proposes to do with his property once he has gone out of the business of offering residential rental units has no bearing at this time in determining plaintiff's right to decide to go out of that business and to invoke the protection extended him for this purpose by the Ellis Act. (See *Javidzad* v. *City of Santa Monica, supra*, 204 Cal.App.3d 524 at pp. 530-531; *City of Santa Monica* v. *Yarmark, supra*, 203 Cal.App.3d 153 at p. 165.) The City retains an amplitude of powers, which are expressly recognized in the Ellis Act (see Gov. Code, §§ 7060.1, 7060.7), that may be relevant insofar as the City may see fit "to regulate the *subsequent* use of the property following its removal from the rental market." (*Javidzad* v. *City of Santa Monica, supra*, at p. 531, original italics.)

We conclude that section 41.10 is preempted by the Ellis Act and is therefore invalid to the extent it is applied to prevent plaintiff from going out of the residential hotel business. (See *Javidzad* v. *City of Santa Monica, supra*, 204 Cal.App.3d 524 at pp. 529-531; *City of Santa Monica* v. *Yarmark, supra,* 203 Cal.App.3d 153 at pp. 161-171.) Accordingly, plaintiff's alleged noncompliance with section 41.10 could not serve as the basis for the preliminary injunction.

(C)

We have thus far seen that the Ellis Act is applicable to plaintiff's situation and that section 41.10 of the Conversion Ordinance cannot be used to impede plaintiff's departure from the residential hotel business. Because the trial court accepted the City's erroneous arguments concerning the interaction between section 41.10 and the Ellis Act, there occurred an error of law that compels reversal. (See *Hunter* v. *City of Whittier, supra,* 209 Cal.App.3d 588 at pp. 595-596; *California Assn. of Dispensing Opticians* v. *Pearle Vision Center, Inc., supra,* 143 Cal.App.3d 419 at p. 426.)

Nor can the injunction be upheld according to the traditional "interim harm" and "likelihood of prevailing on the merits" factors. (See fn. 12 and accompanying text, *ante*.) The first of these factors clearly favors plaintiff. When he initially opposed the grant of the preliminary injunction, and later when he sought to have it modified, plaintiff presented uncontradicted evidence that the injunction would and was destroying his business and driving him into insolvency. These dire prophecies were not idle bleatings: during the pendency of these appeals plaintiff filed for bankruptcy, and foreclosure proceedings were commenced against his hotel. These consequences qualify as irreparable injuries to plaintiff. (See *Greenfield* v. *Bd. of City Plan. Commrs.* (1935) 6 Cal.App.2d 515, 519 [45 P.2d 219].) In addition, plaintiff made an unchallenged showing that the injunction would cause unemployment for the staff of the hotel and its restaurant, and would

result in considerable inconvenience to guests. The second factor also works for plaintiff because the discussion in part VI(B), *ante*, establishes that insofar as the City relies on section 41.10 as the basis for injunctive relief, there is no likelihood the City will prevail on the merits should matters proceed to a full-dress trial. The suffering endured by plaintiff and others as a result of the injunction thus clearly outweighs whatever detriment there may be to any interest the City would have in enforcing an invalid portion of an ordinance.

With the equities so lopsidedly and unequivocally favoring plaintiff, the only possible conclusion is that the trial court abused its discretion in granting the injunction and then by refusing to modify or dissolve it. (See *Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 527 [67 Cal.Rptr. 761, 439 P.2d 889]; *Sullivan* v. *Fox* (1987) 189 Cal.App.3d 673, 683-684 [235 Cal.Rptr. 5].)

### (D)

The City sought injunctive relief by its complaint and its application upon two grounds. The first involved plaintiff's alleged noncompliance with the Conversion Ordinance. As we have seen, this argument is trumped by plaintiff's invocation of the Ellis Act. The second ground was based upon the supposed violation of particular zoning ordinances that would occur if plaintiff converted his hotel to tourist use. These zoning ordinances do not figure in the terms of the injunction, and the parties agree that they were not a basis for the injunction. The following is for the guidance of the trial court and the parties should the City base a renewed application for an injunction on the purported zoning violation.

The ordinances in question concern the North of Market Residential Special Use District. We have previously held that plaintiff has pleaded a cause of action for violation of his constitutional rights with respect to the inclusion of his hotel within that district. (See pt. III, *ante*.) Whether plaintiff is able to substantiate his allegations is an issue which must await future developments. ■ In the meantime, however, the ordinances remain clothed with the presumed constitutionality afforded to all legislative enactments. (See *County of Sonoma* v. *State Energy Resources Conservation etc. Com.* (1985) 40 Cal.3d 361, 368 [220 Cal.Rptr. 114, 708 P.2d 693].) Nothing in this opinion should be construed otherwise.

Nor should anything in this opinion be construed to mean that the Ellis Act has in effect immunized plaintiff from otherwise valid provisions of the Conversion Ordinance and the ordinance establishing the North of Market Residential Special Use District. By enacting those two ordinances the City

has twice determined that land devoted to a particular portion of the private housing sector shall be limited in the uses to which the land may be employed. ██ Nothing in the Ellis Act gives any landlord invoking its protection the unilateral power to effect what amounts to a rezoning of his property simply by invoking his right under the Ellis Act to get out of the residential hotel business. The existence of such a do-it-yourself rezoning power cannot be harmonized with the Legislature's expansive and express declaration that nothing in the Ellis Act "[d]iminishes . . . any power which currently exists or which may hereafter exist in any public entity to grant or deny any entitlement to the use of real property, including, but not limited to, planning, zoning, and subdivision map approvals." (Gov. Code, § 7060.1, subd. (b).)

The City is therefore not precluded from seeking to have enjoined a violation of those ordinances claimed to be impending, so long as this claim is not used as a pretext for halting plaintiff's departure from the residential hotel business. On the other hand, should the City make such an application, plaintiff will be entitled to direct the trial court's attention to his pending attack on the possible infirmity of the ordinances as applied to him. It will then be the trial court's responsibility to make an assessment of the parties' respective prospects of prevailing, just as it would as if such an application was being presented in the first instance.

Our dispositions are as follows: In No. A043073, with respect to plaintiff's cause of action based upon 42 United States Code section 1983, the judgment is reversed and the cause is remanded to the trial court with directions to vacate its order of September 9, 1987, sustaining the general demurrer without leave to amend, and to make a new order in conformity with part III of this opinion. In all other respects the judgment is affirmed. The order awarding interveners attorneys' fees pursuant to Code of Civil Procedure section 1021.5 is reversed. Plaintiff shall recover his costs of appeal.

In Nos. A044386 and A046047, the order granting the preliminary injunction, and the order denying plaintiff's motion to modify the injunction, are reversed. Plaintiff shall recover his costs of appeal.

Channell, J., and Perley, J., concurred.

The petition of respondent City and County of San Francisco for review by the Supreme Court was denied September 20, 1990.