[No. F019412. Fifth Dist. Dec. 14, 1994.]

CUTLER-OROSI UNIFIED SCHOOL DISTRICT et al., Plaintiffs and Appellants, v.
TULARE COUNTY SCHOOL DISTRICTS LIABILITY/PROPERTY SELF-INSURANCE-AUTHORITY et al., Defendants and Respondents.

618

## COUNSEL

Atkinson, Andelson, Loya, Ruud & Romo, James H. Palmer and Kimberly A. Dietsche for Plaintiffs and Appellants.

McCormick, Barstow, Sheppard, Wayte & Carruth, James P. Wagoner, Wendy S. Lloyd, James H. Wilkins and Robert J. Rosati for Defendants and Respondents.

## OPINION

**DIBIASO, J.**—We are required by this case to decide whether public school districts sued in actions seeking declaratory and injunctive relief under the federal Voting Rights Act of 1965 (42 U.S.C. § 1973 et seq.) are entitled to a defense provided by their insurance carrier pursuant to liability policies covering "all sums which the Insured shall become obligated to pay *as damages* . . . by reason of the liability imposed by law" (italics added). In particular, the issues before us include whether the costs of complying with a mandatory injunction or the costs of reimbursing the voting rights plaintiffs for their attorney fees constitute "damages" within the scope of the policies. We will conclude that they are not, and for this and other reasons hold that the insurer had no duty to defend the districts.

FACTUAL AND PROCEDURAL HISTORY

Plaintiffs are three school districts located in Tulare County—the Cutler-Orosi Unified School District, the Dinuba Joint Union High School District, and the Dinuba Elementary School District (the Districts)—and their respective boards of education. In 1991, certain residents of the Districts brought separate actions in federal district court alleging the Districts' at-large method for electing school board members violated section 2 of the Voting Rights Act (42 U.S.C. § 1973).[1] Each of the lawsuits sought declaratory and injunctive relief, to wit:

"(a) A declaration that the at-large election system as utilized by [the district] violates the rights of plaintiffs as secured by Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973;

"(b) A permanent injunction restraining and enjoining the defendant . . . from any further implementation or enforcement of and from holding any further elections under the illegal electoral system;

"(c) An order adopting a constitutionally and statutorily valid districting plan for the election of members of the [governing board];

"(d) An order requiring future elections to be held under a constitutionally and statutorily valid districting plan to be adopted by this court;

". . . . . . . . . . . . . . . . . . . . . . . . .

"(f) An order retaining jurisdiction to render such further and additional orders as the Court may, from time to time, deem appropriate . . . ."

The complaints also prayed for (1) "[a]n order granting plaintiffs their costs of court, necessary expenses of litigation and reasonable attorneys' fees . . . ," and (2) "[a]n order granting such other additional relief at law or in equity as may be deem [sic] appropriate."

---

[1]The actions, all filed on April 5, 1991, in the United States District Court for the Eastern District of California, were Espino v. Cutler-Orosi Unified School Dist. (CV-F-91 169 REC), Reyes v. Dinuba Elementary School Dist. (CV-F-91 170 REC), and Elizondo v. Dinuba Joint Union High School Dist. (CV-F-91 171 REC).

At the time the voting rights actions were filed, each of the Districts belonged to one of two joint power agencies (JPA's)[2] created by the agreement of their respective members for the purpose of operating self-insurance programs and providing "all members coverage for all liability required under California Education Code, Section 35208 and California Government Code Part 6, Section 990, and such other areas of coverage as the Board of Directors may determine." The JPA's, in turn, purchased from defendant Industrial Indemnity (Industrial) "California School Package" policies, which afforded property and liability insurance coverage for the member Districts. Liability coverage under these policies was subject to a $1 million limit for each occurrence, less a self-insured retention of $50,000 or $100,000. Under the heading, "SECTION II—COMPREHENSIVE LIABILITY COVERAGE," the two policies in issue each contained the following provisions:

"A. INSURING AGREEMENTS. Subject to the Limit of Liability and the Self-Insured Retention, [Industrial] agrees:

"1. COVERAGE A. To pay on behalf of the Insured all sums which the Insured shall become obligated to pay as damages, including damages for care and loss of services, by reason of the liability imposed by law, or the liability of others assumed or retained under contract because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person or persons and for damages because of injury to or destruction of property of others, including the loss of use thereof.

"2. COVERAGE B. To pay (insofar as such coverage is not afforded by Coverage A) on behalf of the Insured all sums which the Insured shall become legally obligated to pay for damages which the governing board of the Named Insured is required to insure against in compliance with the provisions of Section 35208 or 72506 of the Education Code of the State of California.[3]

"3. COVERAGE C. In consideration of the specific inclusion of Coverage C in the Declarations, [Industrial] agrees to pay (insofar as such coverage is

---

[2] The Cutler-Orosi Unified School District was a member of the Tulare County School Districts Liability/Property Self-Insurance Authority and the two Dinuba districts were members of the Organization of Self-Insured Schools.

[3] Section 35208 of the Education Code provides in part: "(a) The governing board of any school district shall insure against: [¶] (1) The liability, other than a liability which may be insured against under the provisions of Division 4 (commencing with Section 3200) of the Labor Code [relating to workers' compensation], of the district for damages for death, injury to person, or damage or loss of property; and [¶] (2) The personal liability of the members of the board and of the officers and employees of the district for damages for death, injury to a

not afforded by Coverage A or Coverage B) on behalf of the Insured all sums which the Insured shall become legally obligated to pay for damages which the district is authorized to insure against under Part 6 Sections 989 and 990 of Division 3.6 of Title I of the Government Code.[4]

". . . . . . . . . . . . . . . . . . . . . . . .

"E. CONDITIONS.

"1. DEFENSE, SETTLEMENT, SUPPLEMENTARY PAYMENTS. As respects such insurance as is afforded by Section II of the policy, [Industrial] shall:

"a. defend in his name and behalf any suit against the Insured alleging such injury or damage to which this insurance applies and seeking damages on account thereof, even if such suit is groundless, false, or fraudulent; but [Industrial] may make such investigation, negotiation and settlement of any claim as it deems expedient;

". . . . . . . . . . . . . . . . . . . . . . . .

"c. pay all expenses incurred by [Industrial], all costs taxed against the Insured in any such suit and all interest accruing after the entry of judgment until [Industrial] has paid, tendered or deposited in court such part of such judgment as does not exceed the limit of [Industrial's] liability thereon;

". . . . . . . . . . . . . . . . . . . . . . . .

"The amounts incurred under this agreement, except settlements of claims and suits, are payable in addition to the applicable limit of liability of this policy. . . ."

The agreements which created the JPA's required the JPA's to defend and indemnify their member districts whenever coverage for a claim existed under the applicable Industrial policy.

---

person, or damage or loss of property caused by the negligent act or omission of the member, officer or employee when acting within the scope of his office or employment."

Section 72506 of the Education Code applies to community college districts and therefore has no application to this case.

[4]Section 990 of the Government Code provides in part: "Except for a liability which may be insured against pursuant to Division 4 (commencing with Section 3200) of the Labor Code, a local public entity [as defined in Section 989 of the Government Code] may: [¶] (a) Insure itself against all or any part of any tort or inverse condemnation liability. [¶] (b) Insure any employee of the local public entity against all or any part of his liability for injury resulting from an act or omission in the scope of his employment. [¶] (c) Insure, contract or provide against the expense of defending a claim against the local public entity or its employee, whether or not liability exists on such claim, . . . where such liability arose from an act or omission in the scope of his employment . . . ."

The Districts tendered their respective defenses of the voting rights actions to the JPA's and to Industrial, both of which denied coverage and refused to defend. The Districts and their boards then brought the present action for breach of contract and declaratory relief. They sought a declaration that the voting rights actions exposed them to liability within the coverages provided by the joint power agreements and the Industrial policies, and that therefore there existed a duty on the part of the JPA's and Industrial to provide each of the Districts with a defense in the voting rights actions.

The two Dinuba districts subsequently entered into settlement agreements which in part required the Dinuba districts to pay $50,000 toward the voting rights plaintiffs' attorney fees. The JPA's and Industrial were not parties to these agreements.

All parties moved for summary judgment. Following a hearing, the trial court denied the Districts' motion and granted the motions by the JPA's and Industrial. Judgment was entered in favor of the defendants. The Districts and their boards have appealed.

DISCUSSION

1. *Introduction*

■ A liability insurer owes a duty to defend its insured against third party actions which *potentially* seek damages covered by the insured's policy. The duty to defend is therefore broader than the duty to indemnify and may arise even where coverage is ultimately found not to exist. (*Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153]; *Horace Mann Ins. Co.* v. *Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792]; *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 275 [54 Cal.Rptr. 104, 419 P.2d 168].) Conversely, where there is no potential for the third party to recover on a covered claim, there is no duty to defend. (*Devin* v. *United Services Auto. Assn.* (1992) 6 Cal.App.4th 1149, 1157 [8 Cal.Rptr.2d 263]; *Merced Mutual Ins. Co.* v. *Mendez* (1989) 213 Cal.App.3d 41, 45-46 [261 Cal.Rptr. 273].) The duty, if it exists, arises at the outset of the litigation and is determined on the basis of the allegations of the complaint as well as by extrinsic facts bearing on the possible existence of coverage. (*Montrose Chemical Corp.* v. *Superior Court, supra,* 6 Cal.4th at p. 295.) Moreover, the insurer must defend against both covered and noncovered claims "until the insurer produces undeniable evidence supporting an allocation of a specific portion of the defense costs to a non-covered claim." (*Horace Mann Ins. Co.* v. *Barbara*

*B.*, *supra*, 4 Cal.4th at p. 1081.) Any doubt about whether the relevant facts give rise to a duty to defend must be resolved in favor of the insured. (*Ibid.*) In assessing the insurer's obligations, the policyholder bears the initial burden of proving the potential for coverage. (*Merced Mutual Ins. Co.* v. *Mendez, supra*, 213 Cal.App.3d at p. 47.)

The Districts here contend that because the Industrial policies, and therefore also the joint powers agreements, are ambiguous with respect to the nature and scope of the "damages" for which the policies provide liability coverage, the policies must be interpreted in favor of coverage. The Districts maintain that the word "damages" can reasonably be construed to include the costs incurred by the Districts in (1) complying with any equitable orders issued by the federal district court in favor of the voting rights plaintiffs and (2) reimbursing the voting rights plaintiffs for their attorney fees. In addition, the Districts assert that the voting rights plaintiffs' request for "such additional relief at law or in equity as may be deem[ed] appropriate" creates the potential for coverage, as does the authority given to the Districts by Government Code section 990 to insure against the costs of defending "claims" (see "Coverage C" *supra*). The JPAs and Industrial counter, in part, that the joint powers agreements and the Industrial policies unambiguously apply only to compensatory damages, which could not as a matter of law be recovered by the voting rights plaintiffs in their actions against the Districts.

■ Insurance policies are subject to the ordinary rules of contractual interpretation. The fundamental goal is to give effect to the mutual intentions of the parties; if the policy language is clear, judicial construction is not necessary. However, if the language is uncertain or ambiguous, it must be interpreted in the sense in which the promisor, at the time the promise was made, believed the promisee understood it. (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1264-1265 [10 Cal.Rptr.2d 538, 833 P.2d 545]; *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 821-822 [274 Cal.Rptr. 820, 799 P.2d 1253].) "This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, 'the objectively reasonable expectations of the insured.' [Citation.]" (*Bank of the West* v. *Superior Court, supra*, 2 Cal.4th at p. 1265.) If the application of this rule does not clear up the ambiguity it is resolved against the insurer. (*Ibid.*)

■ Policy provisions must be read in their "ordinary and popular sense," as a layperson would read them, unless "used by the parties in a technical sense or a special meaning is given to them by usage." (*AIU Ins. Co.* v.

*Superior Court, supra,* 51 Cal.3d at p. 822.) "Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." *(Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764].) "In summary, a court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In doing so, the court must interpret the language in context, with regard to its intended function in the policy. [Citation.] This is because 'language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.' [Citations.]" *(Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1265, italics omitted.)

Where, as here, the underlying facts are not in dispute, the proper interpretation of an insurance policy is a question of law; we are thus not bound by the trial court's construction and we must independently settle the meaning of the pertinent policy language. *(Merced Mutual Ins. Co.* v. *Mendez, supra,* 213 Cal.App.3d at p. 45.) Likewise, whether an insured's expectation of a defense is objectively reasonable is a question of law. *(Aim Insurance Co.* v. *Culcasi* (1991) 229 Cal.App.3d 209, 218 [280 Cal.Rptr. 766].)

## 2. *Costs of Equitable Relief*

The Districts rely primarily upon *AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d 807 to support their contention the policies cover the costs of complying with any equitable relief ordered by the federal district court. In *AIU,* the insured, FMC Corporation, was sued by various government agencies for allegedly violating the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. § 9601 et seq.) and related federal and state environmental laws. The agencies sought two types of relief: (1) an injunction ordering FMC to remove existing contamination and cease the further disposal of hazardous waste, and (2) reimbursement for the agencies' response costs attributable to the investigation, monitoring, and initial cleanup of the contaminated sites. FMC, in turn, brought an action against its insurers for a declaratory judgment that FMC's potential liability was covered as "damages" under its general liability policies. (51 Cal.3d at pp. 815-816.)

The Supreme Court determined the pertinent language in the policies was ambiguous when viewed in light of the particular statutory relief available under CERCLA. With respect to the agencies' response costs, the court

concluded that reimbursement of these expenditures could reasonably be thought of as falling within the "plain and ordinary" definition of "damages," i.e., money recovered by a party in compensation for loss or detriment suffered by virtue of the wrongful acts of another. (*AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at p. 825.)[5] The court recognized that reimbursement is a restitutive rather than a compensatory remedy but nevertheless concluded: "Whatever technical distinctions we and other courts have drawn between restitution and compensatory damages in other contexts, in ordinary terms both concepts are within the definition of 'damages.' For the purposes of interpretation, this fact is dispositive." (*Id.* at p. 836.)

The Supreme Court found it somewhat more difficult to answer the question whether FMC's costs of complying with an injunction were also within the policy coverage. On the one hand, the court could not reconcile compliance expenses with the common connotation of the word "damages," because such costs are paid to persons other than aggrieved parties and so do not represent compensation to a victim for harm suffered by the victim. In addition, the court noted that "[i]f the costs of injunctive relief may be deemed 'damages,' the 'as damages' limitation contained in the policies seems to be rendered meaningless." (*AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at p. 838.)

On the other hand, the court observed that under CERCLA the traditional rule, which allows for injunctive relief only when the complaining party's legal remedies are inadequate, was obviated and the distinction between the two remedies eliminated. This result occurred because (1) CERCLA authorized the government to pursue either or both remedies at its option (subject to court approval), and (2) the showing required for both types of relief was the same, they involved the same sorts of expenditures, and they served substantially the same purpose. (*AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at pp. 837-841.)

On balance, the court decided that "it would exalt form over substance to interpret [comprehensive general liability] policies to cover one remedy but not the other." (*AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at p. 840.) It concluded: "Given the practical similarity of remedies available under the

---

[5]Although the definitions of "damages" cited by the Supreme Court referred to "compensation," the court explained: "[W]e do not construe this term in its technical legal sense. (Civ. Code, § 1644; see also *id.,* § 3333 [establishing measure of 'compensatory' damages].) Rather, we take it to encompass any remunerative payment made to an aggrieved party. In addition to 'compensatory damages,' as we explain more fully below, the term 'damages' generically includes restitutive and punitive measures. [Citation.]" (*AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at p. 826, fn. 11.)

environmental statutes at issue here, we believe a reasonable insured would expect both remedies to fall within coverage as 'damages.' Insofar as injunctive relief is an equivalent substitute for the goal of government remedial action, the distinction [between legal and equitable remedies] is inapposite in the CERCLA context." (*Id.* at p. 840.)

The *AIU* court expressly declined to decide whether the word "damages" in a general liability insurance policy included the costs of injunctive relief in contexts other than those involving CERCLA. In fact, it characterized the notion as a "more debatable proposition." (*AIU Ins. Co.* v. *Superior Court*, *supra*, 51 Cal.3d at p. 839, fn. 17.)

■ Here, unlike the situation in *AIU*, there is no "peculiar juxtaposition" of remedies in the Voting Rights Act of 1965 which blurs the distinction between legal and equitable relief. (See *Bank of the West*, *supra*, 2 Cal.4th at p. 1266.) The only remedies available in an action to enforce the Voting Rights Act are declaratory and injunctive relief; an award of compensatory damages is not sanctioned. (*Olagues* v. *Russoniello* (9th Cir. 1985) 770 F.2d 791, 805; *Windy Boy* v. *County of Big Horn* (D.Mont. 1986) 647 F.Supp. 1002, 1023; *Webber* v. *White* (N.D.Tex. 1976) 422 F.Supp. 416, 426; see also *Allen* v. *State Board of Elections* (1969) 393 U.S. 544, 555 [22 L.Ed.2d 1, 11, 89 S.Ct. 817].)

In addition, we find nothing in the provisions of the Voting Rights Act or in the relevant case law that suggests a private litigant is entitled to any type of relief which reasonably could be categorized as "remedial," "remunerative," "restitutional," or "compensatory" because it would reimburse a person or entity for losses or expenses suffered as a result of a violation of the act.[6] Thus, the equitable declaratory and injunctive remedies authorized by the Voting Rights Act as a means of enforcing its proscriptions are not the "functional equivalent" of a form of monetary indemnification or recoupment which may be classified as "damages." Rather, such equitable remedies retain their traditional character as prospective and essentially prophylactic methods of preventing the future reoccurrence of past illegal actions. (See *Allen* v. *State Board of Elections*, *supra*, 393 U.S. at p. 555 [22 L.Ed.2d at p. 11] [involving section 5 of the Voting Rights Act of 1965 (42 U.S.C. § 1973c)].)

Consequently, even assuming the word "damages" in the Industrial policies is ambiguous when read in the context of the Voting Rights Act, we find

---

[6]We exclude from consideration here an award of attorney fees authorized by 42 United States Code section 1973*l*(e). The subject is discussed in part 3, *post.*

nothing in the particular statutory scheme of relief involved (*AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at p. 841) which would lead an objectively reasonable insured to conclude that the costs of complying with a federal court equitable order would be covered by the policies. (*Id.* at p. 840; see also *Bank of the West, supra,* 2 Cal.4th at p. 1268.) In addition, to construe the word "damages" to include such costs would effectively strike the "as damages" qualification from the policy language. (*AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at p. 838.) It would also, in effect, permit the Districts to shift to Industrial, and therefore avoid, the costs of meeting the Districts' federally mandated obligations, in force even in the absence of the lawsuit, to eliminate all racial discrimination in voting. (See *Allen* v. *State Board of Elections, supra,* 393 U.S. at p. 548 [22 L.Ed.2d at p. 7].) Although we do not decide the point, there would appear to be substantial public policy reasons for prohibiting such a practice. (See Civ. Code, § 1668; Rest.2d, Contracts, §§ 178-179.)

Other courts in a variety of different situations have come to essentially the same conclusions we have reached here. (See *Nationwide Ins. Co.* v. *King* (S.D.Cal. 1987) 673 F.Supp. 384; *Ladd Const. Co.* v. *Ins. Co. of North America* (1979) 73 Ill.App.3d 43 [29 Ill.Dec. 305, 391 N.E.2d 568]; *Garden Sanctuary, Inc.* v. *Insurance Co. of No. Amer.* (Fla.Dist.Ct.App. 1974) 292 So.2d 75; *Aetna Casualty and Surety Company* v. *Hanna* (5th Cir. 1955) 224 F.2d 499 [53 A.L.R.2d 1125]; *Desrochers* v. *New York Cas. Co.* (1954) 99 N.H. 129 [106 A.2d 196].) The recent decision in *School Dist. of Shorewood* v. *Wausau Ins.* (1992) 170 Wis.2d 347 [488 N.W.2d 82] is illustrative. In dispute there was whether general liability policies covered expenses incurred by the insured school districts in settling a racial discrimination lawsuit seeking declaratory and injunctive relief. The Wisconsin Supreme Court concluded that coverage for "damages" extended only to legal compensation for past injuries and did not encompass the cost of complying with a prospective injunctive decree. (*Id.* at p. 89.) The court found its views consistent with the fundamental distinction between damages, which are remedial in nature, and injunctions, which are preventative. Further, the court pointed out that a construction in favor of coverage would render the "as damages" limitation mere surplusage "because any expense incident to litigation would then be covered by the policies." (*Id.* at p. 90; See also *Maryland Cup Corp.* v. *Employers Mutual* (1990) 81 Md.App. 518 [568 A.2d 1129] [employment discrimination claims seeking equitable relief are not claims for damages].)

## 3. *Costs and Attorney Fees*

The Districts also contend the voting rights plaintiffs' prayer for out of pocket costs and attorney fees triggered the duty to defend because these expenses, if awarded, would constitute "damages" under the policies.

A number of other jurisdictions have considered similar claims in other contexts, with conflicting results. The issue has arisen most often in connection with federal civil rights suits in which the plaintiffs requested attorney fees pursuant to the Civil Rights Attorney's Fees Awards Act of 1976 (42 U.S.C. § 1988), which permits the court in its discretion to award the prevailing party "a reasonable attorney's fee as part of the costs." An example where such attorney fees were found not to constitute "damages" is *Sullivan County, Tenn.* v. *Home Indem. Co.* (6th Cir. 1991) 925 F.2d 152. There, the federal appeals court viewed 42 United States Code section 1988 as reflecting an unambiguous intent to treat attorney fees as costs in order to ensure that the fees could be assessed against a state agency notwithstanding the bar to such awards presented by the Eleventh Amendment to the federal Constitution. (925 F.2d at p. 153.) The court felt the supplementary payment provisions of the policies, which made the insurer responsible for all costs taxed against the insured in a suit for damages, demonstrated "very persuasively" the policy meant to refer to "damages" only in the conventional sense of the term, for if the word "had been used originally in a sense that already included costs, the quoted portion of the Supplementary Payments provision would have been totally unnecessary . . . ." (*Ibid.*; see also *School Dist. of Shorewood* v. *Wausau Ins., supra,* 488 N.W.2d at pp. 92-93; *Board of Cty. Com'rs. etc.* v. *Guarantee Ins. Co.* (D.Colo. 1981) 90 F.R.D. 405, 407-408.)

We find *Sullivan County, Tenn.* v. *Home Indem. Co., supra,* 925 F.2d 152, to be indistinguishable in substance from the case before us. The Voting Rights Act, like the Civil Rights Attorney's Fees Awards Act, permits the trial court to award "a reasonable attorney fee as part of the costs." (42 U.S.C. § 1973*l*(e).) Because the two pieces of legislation share similar wording and purpose, they should be construed in a similar fashion. (*Kirksey* v. *Danks* (S.D.Miss. 1985) 608 F.Supp. 1448, 1452, fn. 1.) In addition, the Industrial policies in issue here, as the insurance policies involved in *Sullivan County,* included a supplementary payment provision obligating the insurer to pay all costs taxed against the insured in a suit seeking damages on account of bodily injury or property damage. ■ We agree with the *Sullivan County* court that to treat attorney fees as damages in such circumstances would ignore the evident intent of the policies to differentiate between costs and damages and would render the supplementary payment provisions superfluous. (*School Dist. of Shorewood* v. *Wausau Ins., supra,* 488 N.W.2d at pp. 92-93; *Sullivan County, Tenn.* v. *Home Indem. Co., supra,* 925 F.2d at pp. 153-154; *Board of Cty. Com'rs. etc.* v. *Guarantee Ins. Co., supra,* 90 F.R.D. at pp. 407-408.)

The Districts correctly point out that a statutory characterization of attorney fees as costs is not necessarily dispositive of the proper construction,

under state law, of an insurance policy. (*AIU Ins. Co.* v. *Superior Court*, *supra*, 51 Cal.3d at pp. 825, 831 ["We are not bound by distinctions or definitions contained in [the statute] itself, if such distinctions do not reflect the intent of the parties to the . . . policies at the time of their formation."].) However, other factors operate here which provide additional, as well as independent, justification for our conclusion that the term "damages" under the insuring provisions of the instant policies "clear[ly] and explicit[ly]" (*AIU Ins. Co.* v. *Superior Court*, *supra*, 51 Cal.3d at p. 822) does not include the attorney fees incurred by the voting rights plaintiffs. First, irrespective of how they are treated in the Voting Rights Act, an award of attorney fees, like other costs, "does not compensate the plaintiff for the injury that first brought him into court[;] [i]nstead, the award reimburses him for a portion of the expenses he incurred in seeking . . . relief." (*Hutto* v. *Finney* (1978) 437 U.S. 678, 695, fn. 24 [57 L.Ed.2d 522, 537, 98 S.Ct. 2565, 2576].) Attorney fees therefore are inconsistent with the concept of "damages" as the term is used in its ordinary and popular sense, that is, compensation paid to a party for the loss or detriment suffered because of the wrongful act of another. (*AIU Ins. Co.* v. *Superior Court*, *supra*, 51 Cal.3d at pp. 825-828.) Second, broadly interpreting the word "damages" to include *all* forms of civil monetary liability effectively renders meaningless the "as damages" limitation in the Industrial policies. (See *AIU Ins. Co.* v. *Superior Court*, *supra*, 51 Cal.3d at pp. 827-828.)

The Districts primarily rely on two cases, *City of Ypsilanti* v. *Appalachian Ins. Co.* (E.D.Mich. 1982) 547 F.Supp. 823, and *City of Kirtland* v. *Western World Ins.* (1988) 43 Ohio App.3d 167 [540 N.E.2d 282], where attorney fees awardable in federal civil rights actions were held to be "damages" under the general liability policies in issue. In *City of Ypsilanti* v. *Appalachian Ins. Co.*, *supra*, 547 F.Supp. 823, the supplementary payment provisions described covered "costs" as "investigations, adjustments and legal expenses." This rather uncertain definition led the court to conclude the word "costs" referred only to the expenses of carrying on the defense and not to the expenditures of the plaintiff in prosecuting the action. (*Id.* at p. 827.) The opinion does not mention the provision in 42 United States Code section 1988 which expressly treats attorney fees as an element of costs. (See *School Dist. of Shorewood* v. *Wausau Ins.*, *supra*, 488 N.W.2d at p. 93 [distinguishing *City of Ypsilanti*]; *Sullivan County, Tenn.* v. *Home Indem. Co.*, *supra*, 925 F.2d at pp. 153-154 [same].) In *City of Kirtland* v. *Western World Ins.*, *supra*, 43 Ohio App.3d 167, the court, referring to the fact that the insurer's claims examiner had characterized attorney fees as damages, held the insured "will not bear the burden of [the insurer's] own uncertainty as to a term in a policy [the insurer] wrote." (*Id.* at p. 169.)

The other two cases cited by the Districts are also unpersuasive. *Sokolowski* v. *Aetna Life & Cas. Co.* (S.D.N.Y. 1987) 670 F.Supp. 1199 arose from an action under the Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. §§ 1001-1461). The relevant provision of this act, which authorized the trial court to award "a reasonable attorney's fee *and* costs of action to either party" (29 U.S.C. § 1132(g), italics added), obviously distinguished attorney fees from costs (670 F.Supp. at p. 1208). *Hyatt Corp.* v. *Occidental Fire & Cas.* (Mo.App. 1990) 801 S.W.2d 382 involved attorney fees awarded as part of a settlement in a federal class action for damages. This opinion relied on *City of Ypsilanti* without analysis. (*Id.* at pp. 393-394.)

### 4. *The Prayer*

The Districts next contend the prayer of the voting rights plaintiffs for "[a]n order granting such other additional relief *at law* or in equity as may be deem[ed] appropriate" (italics added) created the potential for an award of damages sufficient to generate a duty on the part of the JPA's and Industrial to provide a defense to the Districts.

█ However, as we previously explained, no form of "damages" is available in an action under the Voting Rights Act. (*Olagues* v. *Russoniello*, *supra*, 770 F.2d at p. 805; *Windy Boy* v. *County of Big Horn*, *supra*, 647 F.Supp. at p. 1023.) The inclusion of a prayer for such relief in the complaint was therefore an exercise in legal futility. Furthermore, the Eleventh Amendment prohibits actions in federal court for damages against a state agency. (*Belanger* v. *Madera Unified School Dist.* (9th Cir. 1992) 963 F.2d 248, 250.) In addition, the voting rights plaintiffs did not allege in their complaints any facts which, if proven, would have entitled them to compensation for bodily injury or property damage. Assertions of potential coverage which are based entirely on speculation do not give rise to a duty to defend. (*Hurley Construction Co.* v. *State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533, 538 [12 Cal.Rptr.2d 629]; *Bohannon* v. *Aetna Casualty & Surety Co.* (1985) 166 Cal.App.3d 1172, 1177 [212 Cal.Rptr. 848]; *Giddings* v. *Industrial Indemnity Co.* (1980) 112 Cal.App.3d 213, 220 [169 Cal.Rptr. 278].) The same is true about the conjectural possibility of a judgment for damages based upon the inherent power of a court of equity to award money damages. (*School Dist. of Shorewood* v. *Wausau Ins.*, *supra*, 488 N.W.2d at pp. 91-92; *Ladd Const. Co.* v. *Ins. Co. of North America*, *supra*, 73 Ill.App.3d 43, 48 [391 N.E.2d at pp. 572-573].) If such surmise were sufficient to impose a duty to defend upon an insurer, it would become obligated to defend all suits regardless of the policy provisions or the allegations of the relevant complaint. (*School Dist. of Shorewood* v. *Wausau Ins.*, *supra*, 488 N.W.2d at pp. 91-92.)

### 5. Coverage C

Last, the Districts point to Coverage C of the policies, which requires Industrial to indemnify the Districts for "all sums which the Insured shall become legally obligated to pay for damages which the district is authorized to insure against under Part 6 Sections 989 and 990 of Division 3.6 of Title I of the Government Code." Section 990 of the Government Code authorizes a public entity to, among other things, "(c) Insure, contract or provide against the expense of defending a claim against the local public entity or its employee, whether or not liability exists on such claim, . . ."[7] According to the Districts, "the policies, by incorporating Government Code section 990, also broadly cover 'the expense of defending a claim' [and] [c]ertainly the Voting Rights Actions allege a 'claim.' "

The Districts' argument appears to consist of the following syllogism: (1) section 990 of the Government Code allowed the Districts to insure themselves to the full extent of their potential liability (major premise); (2) the Districts' potential liability included the cost of complying with an injunction (minor premise); (3) therefore, the Districts were insured against all such costs (conclusion).[8]

 There are two flaws in this reasoning. First, the conclusion that the Districts were insured against compliance costs does not necessarily follow from the two general premises from which it purports to be drawn. That the Districts were permitted by state law to insure against the particular liability—a question we need not and do not reach—does not necessarily mean any did in fact insure against this liability. (See *AIU Ins. Co.* v *Superior Court, supra,* 51 Cal.3d at p. 818.) Second, the language of Coverage C, the most relevant and determinative factor, is ignored. As set out *supra,* Coverage C requires Industrial to pay only those sums which the Districts become legally obligated to pay *"for damages* which the district is authorized to insure against." (Italics added.) Since, as we have previously explained, the Districts could not as a matter of law be held liable "in damages" in the voting rights actions, Coverage C did not require Industrial to provide the Districts with a defense to these actions.

---

[7] See footnote 4, *ante.*

[8] The Districts have asked us to take judicial notice of three documents which, they assert, reflect the legislative intent behind Government Code section 990 to authorize public agencies to insure themselves to the full extent of their potential liability. The JPA's do not quarrel with this general proposition but argue section 990 applies only to potential *tort* liability and does not allow a public agency to insure against the costs of providing equitable relief. Because we will not find it necessary to address this specific issue, the Districts' requests for judicial notice are denied.

## DISPOSITION

The judgment is affirmed. Respondents are awarded their costs on appeal.

Ardaiz, P. J., and Buckley, J., concurred.

Appellants' petition for review by the Supreme Court was denied March 16, 1995. Mosk, J., was of the opinion that the petition should be granted.