[No. A080499. First Dist., Div. Four. Jan. 8, 2001.]

PETER BULLOCK et al., Plaintiffs and Appellants, v.
MARYLAND CASUALTY COMPANY, Defendant and Respondent.

[No. A081283. First Dist., Div. Four. Jan. 8, 2001.]

PETER BULLOCK et al., Plaintiffs and Appellants, v.
AMERICAN GUARANTY & LIABILITY INSURANCE COMPANY et al., Defendants and Respondents.

[No. A081878. First Dist., Div. Four. Jan. 8, 2001.]

PETER BULLOCK et al., Plaintiffs and Appellants, v.
FIREMAN'S FUND INSURANCE COMPANY, Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, IV, V, VI, VII, VIII, and IX.

**COUNSEL**

John B. Keating for Plaintiffs and Appellants.

Cooper, White & Cooper, Robert L. Sallander, Jr., and Rita M. Castro for Defendant and Respondent American Guaranty & Liability Insurance Company.

Law Offices Robert Bruce Bybee and Robert Bruce Bybee for Defendant and Respondent Liberty National Fire Insurance Company.

Hardin, Cook, Loper, Engel & Bergez, Lombardi, Loper & Conant, Ralph A. Lombardi and Lori A. Sebransky for Defendant and Respondent Fireman's Fund Insurance Company.

Low, Ball & Lynch, Thomas E. Mulvihill and Lisa M. Pierce for Defendant and Respondent Western Heritage Insurance Company.

Wright, Robinson, Osthimer & Tatum, James C. Nielsen and Thomas H. Nienow for Defendant and Respondent Maryland Casualty Company.

Heller, Ehrman, White & McAuliffe, David B. Goodwin and Esta L. Brand for Pacific Gas and Electric Company as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**SEPULVEDA, J.**—These cases represent another chapter in, or more precisely a sequel to, the protracted dispute between the City and County of San Francisco (City) and plaintiffs Peter Bullock and Elke Schlosser, concerning Bullock's efforts to convert the Abigail Hotel, formerly a residential hotel, into a hotel for tourists and city visitors. Plaintiffs brought this action to require certain liability insurers to absorb costs plaintiffs incurred in defending an action the City brought against them in 1988. The trial court entered judgments on demurrer in favor of defendants Liberty National Fire Insurance Company and Maryland Casualty Company, and granted judgment on the pleadings in favor of defendants American Guaranty & Liability Insurance Company, Fireman's Fund Insurance Company, and Western Heritage Insurance Company. We will affirm the judgments.

### BACKGROUND

Related matters have been before us on at least three prior occasions. In *Bullock v. City and County of San Francisco* (1990) 221 Cal.App.3d 1072 [271 Cal.Rptr. 44] (*Bullock I*), we reviewed certain orders made in an action brought by Bullock against the City, as well as orders made in an action brought by the City against Bullock in October 1988 (the underlying action here, discussed in more detail below). We referred to an earlier, unpublished decision setting aside the dismissal of yet another action by plaintiffs, or persons associated with them, against the City. (*Id.* at p. 1092, fn. 10.) However, in *City and County of San Francisco v. Bullock* (Nov. 10, 1996, A068409), review denied and opinion ordered nonpublished February 19, 1990, we affirmed the ultimate dismissal of plaintiffs' claims.

In this action plaintiffs seek to recover costs of defense they incurred in the City's 1988 action against them, parts of which were before us in *Bullock I.* In its complaint in that action, a copy of which was incorporated by reference in the complaint here, the City alleged as follows: The Abigail Hotel contained 20 "tourist units" and 42 "residential units" regulated by the City's Residential Hotel Conversion and Demolition Ordinance (see San Francisco Ord. No. 400-83, added in 1983; San Francisco Ord. No. 217.85, added in 1985) (the Ordinance). The Ordinance imposed restrictions on the rental of residential units to persons other than permanent residents. For at

least six years preceding the filing of the complaint, plaintiffs violated these restrictions, renting too many residential units to persons other than permanent residents. From late 1984 to mid-1988, plaintiffs acted under a preliminary injunction that "permitted [plaintiffs] to rent all of the hotel's vacant rooms to tourists." However, on July 6, 1988, the superior court dissolved the injunction and denied plaintiffs any exemption from the terms of the Ordinance.

Based on these allegations the City asserted five causes of action: (1) that by the conduct described above, and also by failing to post certain required notices and reports and maintain certain daily logs, plaintiffs were violating the Ordinance; (2) that by offering (advertising) the premises for use as a "tourist hotel," plaintiffs were violating the City Planning Code (Planning Code); (3) that plaintiffs' violations of the Planning Code and the Ordinance were a public nuisance, abatement of which was authorized by state and municipal laws; (4) that plaintiffs' conduct constituted unfair and unlawful business practices under Business and Professions Code section 17200 et seq.; and (5) that plaintiffs' conduct warranted the imposition of various "civil penalties" under the Planning Code, the Ordinance, and Business and Professions Code section 17206.

The City prayed for (1) preliminary and permanent injunctions prohibiting plaintiffs from renting residential units to nonresidential renters in violation of the Ordinance; (2) injunctions against violating the posting and log-keeping provisions of the Ordinance; (3) injunctions against violating the Planning Code restrictions on tourist hotels; (4) injunctions against, and abatement of, "the public nuisances presented by the premises"; (5) appointment of a receiver under Business and Professions Code section 17203 "to take over management and control of the premises" in order to prevent continuing unfair practices; (6) civil penalties of $500 per day under the Planning Code; (7) civil penalties of $250 per day per violation of the Ordinance; (8) civil penalties of $2,500 per violation under the Business and Professions Code; (9) costs and attorneys' fees; and (10) "such further and other relief as the court deems just."

The City apparently dismissed its 1988 complaint on or about October 6, 1994. Two years later—eight years after the City filed its complaint—plaintiffs brought this action against 10 insurance companies they alleged had sold them liability insurance during the period of "at least 1980 to 1993." Plaintiffs alleged that they had "tendered the defense of [the City's] action separately to each defendant, but each defendant refused to defend the action and denied coverage," and that each defendant repeated that refusal when plaintiffs asked them to reconsider. Plaintiffs further alleged that defendants failed to fully and fairly investigate the renewed tender of defense, and that "[s]ome" defendants failed to respond in a timely manner.

Based on these allegations, plaintiffs asserted claims for breach of contract, bad faith, and fraud. The five defendants now before us challenged the complaint by general demurrer or motion for judgment on the pleadings. The trial court sustained each of these challenges, reciting in all but one case that the orders were made "without leave to amend." The one exception was silent as to leave to amend, but the court thereafter entered judgment on that order, as on the others. Plaintiffs filed three timely appeals.

DISCUSSION

I.

*The Duty to Defend.*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

II.

*Compliance Costs.*

A. *Introduction.*

Plaintiffs contend that the City's complaint exposed them to potential liability for "damages" because it implicitly sought to compel their compliance with provisions of the Ordinance requiring them to incur or pay what plaintiffs refer to as "mitigation" costs. In particular they cite former section 41.10 of the Ordinance (section 41.10), which requires that any owner seeking to convert a hotel to nonresidential use must, as a condition of the required "conversion permit," provide or pay for housing to replace the units that will be removed from the residential market. (*Ibid.*)[1] Plaintiffs also cite provisions making it unlawful to change the use of a unit, or eliminate or

---

\*See footnote, *ante,* page 1435.

[1] As in effect in 1988, section 41.10, subdivision (a), provided: "Prior to the issuance of a permit to convert, the owner or operator shall provide one-for-one replacement of the units to be converted by one of the following methods: [¶] (1) Construct or cause to be constructed a substantially comparable-sized unit to be made available at comparable rent to replace each of the units to be converted; or [¶] (2) Cause to be brought back into the housing market a comparable unit . . . ; or [¶] (3) Construct or cause to be constructed or rehabilitated apartment units for elderly, disabled or low-income persons or households . . . . [¶] (4) Pay to the City and County of San Francisco an amount equal to Forty Percent (40%) of the cost of construction of an equal number of comparable units plus site acquisition costs. All such payments shall go into a San Francisco Residential Hotel Preservation Fund Account . . . ."

As we noted in *Bullock I, supra,* 221 Cal.App.3d at page 1100, footnote 17, section 41.10 was subsequently reenacted in somewhat different form as section 41.13. We follow our earlier practice, which the parties too employ, of referring to the provision by its original number.

convert a unit, without a conversion permit, and empowering the superintendent of building inspection to "institute a civil proceeding for injunctive relief" in response to "any action unlawful under this Chapter." (Ord. § 41.16, subds. (a)(1) & (e).)

Plaintiffs contend that these provisions bring the City's complaint within the rationale of *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807 [274 Cal.Rptr. 820, 799 P.2d 1253] (*AIU*), where the Supreme Court held that comprehensive general liability policies, materially similar to those at issue here, could be reasonably understood to cover toxic cleanup costs imposed in litigation under the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.) and related state and federal laws. The City's claim against plaintiffs, however, differs in several critical respects from those before the court in *AIU*.

The insured in *AIU* sought to establish coverage with respect to a number of suits by public agencies alleging that the insured was responsible for the contamination of certain waste disposal sites. The agencies sought injunctions to prevent further contamination and to require the cleanup of contamination already caused, plus "reimbursement of [the agencies'] costs of investigating, monitoring, and initiating cleanup of hazardous waste for which [the insured] allegedly is responsible." (*AIU, supra,* 51 Cal.3d at p. 816.) The Supreme Court concluded that the monetary reimbursement sought by the agencies ("response costs") could fall within the reasonable expectations of an insured as to what constitutes "damages." (*Id.* at pp. 833, 837.) The court further held that cleanup costs incurred by an insured under compulsion of an injunction could also be covered, primarily because they appeared to be the functional equivalent of reimbursing publicly incurred costs, and an insured would not expect coverage to depend on the prosecuting agency's fortuitous choice of remedies. (*Id.* at pp. 838-841.)

In seeking to apply this holding to the present case, plaintiffs focus almost exclusively on the supposed "mitigative" nature of the remedy at issue in *AIU*, arguing that the City's action exposed them to similar "mitigative" measures. Quoting our own opinion in *Bullock I*, plaintiffs assert that section 41.10 operates to "mitigate[] the adverse impact on the persons who will be displaced by plaintiff's conversion" (*Bullock I, supra,* 221 Cal.App.3d at p. 1101), and that their exposure to the imposition of such "mitigation costs" makes the City's suit indistinguishable from the actions considered in *AIU*. We reject this contention, first because plaintiffs have failed to allege, and apparently cannot allege, that they were in danger of being "legally obligated" to incur the "mitigation" expenses in question, and second because those expenses are not comparable to the remedies held in *AIU* to be the equivalent of damages.

### B. "Legally Obligated to Pay."

█ Plaintiffs' exclusive emphasis on the supposed "mitigative" character of the expenses at issue overlooks a critical part of the *AIU* analysis. The court there declared that the question of coverage turned on three subsidiary questions: (1) whether an adverse order in the underlying suits would " 'legally obligate' [the insured] to pay" cleanup costs; (2) whether the costs would "constitute 'damages' " under the terms of the policies, and (3) whether the costs would be "incurred because of 'property damage.' " (*AIU, supra,* 51 Cal.3d at p. 818.) "Only if all three conditions are fulfilled," the court wrote, "will the insurers' duty to provide coverage arise under the policies." (*Ibid.*) █ In other words, it is not enough that a claimant seeks to exact by some means a payment that might serve the function of "damages." The lawsuit must expose the insured to the possibility of being "legally obligated" to make such payments. In *AIU* this obligation was in little doubt; the underlying suits expressly sought judgments or court orders compelling the insured to pay or incur the expenses at issue. (See *id.* at p. 824.) The only point of controversy was whether the phrase "legally obligated" extended to payments compelled by *equitable* remedies, such as injunctive or specific relief, as distinguished from the quintessentially *legal* remedy of a judgment for damages. (*Ibid.*) Not surprisingly, the court found the law-equity distinction inadequate to defeat coverage. (*Id.* at p. 825.)

Here the insureds face a difficulty not present in *AIU*, because it does not appear that an order obligating plaintiffs to pay or incur "mitigation" costs either was sought, or could have been made. Apart from some correspondence outside the complaint, which we discuss below, plaintiffs have offered no reason to suspect that the City ever contemplated seeking a judgment requiring plaintiffs to comply with section 41.10. So far as the pleadings and the terms of the Ordinance show, the City lacked the authority to obtain such relief, and made no attempt to seek it.

Nothing in the City's complaint suggests the possibility of an order compelling compliance with section 41.10. The City did not pray for an award of "in lieu fees"; nor did it seek an injunction compelling plaintiffs to construct, acquire, or otherwise provide substitute housing, as contemplated by section 41.10. Instead the City prayed for (1) injunctions *prohibiting violations* of the Ordinance and abating the public nuisances allegedly arising from those violations, (2) appointment of a receiver, and (3) civil penalties.

Nor does it appear that the Ordinance authorized the City to seek, or a court to issue, the mandatory "mitigative" relief on which plaintiffs' argument depends. The Ordinance specifically authorized City officials to (1)

recover "civil penalties" in specified amounts for such infractions as "insufficient filing" or failing to post and submit certain required reports (Ord., §§ 41.7, subds. (d) & (e), 41.8, subd. (d)); (2) recover a "civil penalty" for "unlawful conversion," consisting of "three . . . times the daily rate per day," not to exceed $5,000 (Ord. § 41.16, subd. (c)); and (3) obtain "injunctive relief," implicitly against "any action unlawful under this Chapter" (Ord., § 41.16, subd. (e)). In addition, the Ordinance provided that any "permanent resident injured by any action unlawful under this Chapter" could bring an action for "injunctive relief *and damages.*" (Ord., § 41.16, subd. (e), italics added.) The Ordinance did not authorize the *City* to recover damages of any kind, and it did not authorize *anyone* to obtain *any* kind of relief mandating compliance with section 41.10. The specific enumeration of some remedies while not mentioning others strongly implies that the excluded forms of relief are not in fact available. (See *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1390-1391 [241 Cal.Rptr. 67, 743 P.2d 1323] [applying maxim *expressio unius exclusio alterius est,* i.e., to express one thing is to exclude another].)

Section 41.10 itself contains no remedial terms; it provides for no relief in the legal sense at all. Rather it prescribes conditions under which a permit may be issued. The only apparent effect of failure to satisfy these conditions is that no permit will issue, and the owner will be prohibited by the Ordinance from engaging in the regulated conduct—most notably, renting residential rooms to nonresidential occupants. An owner subject to the permit requirement may choose either to comply with the condition, refrain from the regulated conduct, or (as plaintiffs did) engage in the regulated conduct *without* a permit, thereby violating the Ordinance. In none of these situations does that person become "legally obligated to pay" the costs of complying with section 41.10. He or she remains *legally* free not to pay them. Section 41.10 imposes on hotel owners no "legal[] obligat[ion]" whatsoever. By its plain terms it imposes only a *condition* on a permit required under the Ordinance to engage in specified activities.

Rather than discuss the actual text of the Ordinance, or its logical effect, plaintiffs cite our opinion in *Bullock I* for the proposition that "[b]y its complaint, the City sought to compel Dr. Bullock's compliance with section 41.10." The short answer to that assertion is that compulsion comes in many forms, only one of which—"legal[] obligat[ion]"—triggers coverage under defendants' policies. In *Bullock I* we were concerned only with the validity of the Ordinance insofar as it interfered with plaintiffs' right under state law to " 'go out of [the residential hotel] business.' " (Gov. Code, §§ 7060, 7060.7, quoted in *Bullock I, supra,* 221 Cal.App.3d at p. 1099.) We held in effect that section 41.10 imposed an undue burden on that right, and was

preempted. (221 Cal.App.3d at pp. 1099-1102.) We had no occasion to decide, and did not even contemplate, the distinctions relevant to the issue now before us. Even so, our analysis there is *explicitly* consistent with those distinctions. We wrote that section 41.10 *"conditions issuance of a permit to convert . . .* on the owner either furnishing comparable units . . . or making a substantial 'in lieu' payment" (221 Cal.App.3d at p. 1099, italics added), and that the City sought to "condition" plaintiff's departure from the residential hotel business "upon the payment of ransom" (*id.* at p. 1101).

Our vivid description of the act contemplated by the condition does nothing to alter the fact that a conditional regulatory imposition simply is not, without more, a *legal obligation to pay.* The City may well have intended, as plaintiffs asserted below, to coerce compliance with section 41.10 by enjoining Dr. Bullock in his operation of the hotel until he complied with those provisions. Alternatively, the City may have hoped to prevent the removal of plaintiffs' hotel from the residential housing market. In either case, the City made no apparent effort to legally obligate plaintiffs to pay the expenses or undertake the acts described in section 41.10. The coercive tool employed—and the only tool the Ordinance appeared to provide—was a traditional prohibitory injunction barring plaintiffs, on pain of contempt, from continuing to rent rooms to nonresidents without a permit. Such an injunction would not become the equivalent of "damages" merely because it would compel plaintiffs to choose, on pain of contempt, between complying with the conditions of a permit and refraining from conduct requiring a permit.

We are satisfied that neither the City's complaint nor the terms of the Ordinance suggest any potential for making plaintiffs "legally obligated to pay" the costs contemplated by section 41.10.

### C. *The 1989 Letters.*

Plaintiffs contend somewhat obliquely that whether or not the City was entitled to *obtain* a judgment compelling compliance with section 41.10, the City *sought* such a judgment, or threatened to do so, thereby triggering a duty to defend. This suggestion tacitly invokes the principle that a liability insurer "may not decline to defend a suit merely because it is devoid of merit." (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 298 [24 Cal.Rptr.2d 467, 861 P.2d 1153].) However, the principle does not apply here because the City in fact never asserted the meritless claim in question.

As evidence to the contrary, plaintiffs refer to letters and a notice they apparently received from City officials in April 1989. These documents were

offered below in support of plaintiffs' request for leave to amend the complaint. They are cited here as evidence that "[t]he City . . . had determined that Dr. Bullock had already converted the units, and therefore was no longer able to comply with the Residential Hotel Ordinance other than by payment of the mitigation payments." This statement apparently asks us to infer that when the letters were written, the City contemplated seeking an injunction to compel such compliance.

The 1989 letters are far from a direct threat to pursue any such claim. At most they suggest a tentative positioning by City officials and attorneys as a possible move toward such a strategy. We seriously doubt that correspondence outside the pleadings which merely hints at a possible litigation strategy—one never actually pursued—is sufficient to establish a duty to defend an otherwise noncovered lawsuit. In *Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857 [77 Cal.Rptr.2d 107, 959 P.2d 265] (*Foster-Gardner*), the court held that notices from environmental agencies requiring an insured to undertake cleanup measures did not trigger coverage under liability policies in which the insurer undertook to defend any "suit" against the insured. The policies before us all likewise refer to the defendants' undertakings to defend "suit[s]" against plaintiffs. If a formal notice directly imposing legal burdens on the insured under applicable law is insufficient to trigger liability insurance coverage, we fail to see how the mere unexecuted threat to pursue a potentially covered legal remedy can have a greater effect. (See *id.* at pp. 878-879 [discussing meaning of terms "suit" and "claim" in context of liability policies].) Here of course a "suit" was filed, but not one asserting the claims to which plaintiffs allude. The duty to defend generally depends upon the allegations of the complaint in the underlying action. (See *id.* at p. 880.)

We need not ultimately decide whether a threat to compel compliance with section 41.10 would effectively enlarge the allegations of the City's complaint, for coverage purposes, because—as we discuss immediately below—the costs contemplated by that section are not equivalent to those at issue in *AIU* and could not be reasonably understood as "damages" under the rationale of that case. Thus even if the City had explicitly prayed for an order requiring plaintiffs to comply with section 41.10 by providing replacement housing or paying "in lieu" fees, that claim would not have triggered a duty to defend.

D. *Compliance Costs as "Damages."*

The essential reason coverage was found in *AIU* is that the government agency claimants sought to compel the insured to pay or incur costs

that served the same function as traditional damages in that they compensated for, or sought to alleviate, harm caused by *past conduct*. The court carefully limited its holding to cleanup expenses and "response costs" incurred *after* a "release of hazardous waste." (51 Cal.3d at p. 833.) The court explicitly withheld coverage for "prophylactic costs . . . incurred to pay for measures taken in advance of any release of hazardous waste" (*id.* at p. 843), elsewhere writing, "Because the third party suits here . . . rest on allegations of *past and present damage* to land and water on and surrounding hazardous waste sites, they concern reimbursement not for prophylactic purposes, but rather for *remedial and mitigative actions.*" (*Id.* at pp. 832-833, italics added.) The court was careful to say that its holding did not extend to, and no duty to defend arose under, "government regulations or court orders requiring businesses such as [the insured] to undertake purely prophylactic measures designed to prevent future discharges of hazardous waste." (*Id.* at p. 832; see *id.* at p. 833, fn. 13; see also *Foster-Gardner, supra,* 18 Cal.4th 857, 878.)

 This distinction between remedial and prophylactic measures is fatal to plaintiffs' attempt to bring costs incurred in complying with section 41.10 within the rationale of *AIU*. The expenses described in section 41.10 are not intended to make anyone whole for, or compensate for the damaging effects of, past conduct. They are intended to avert the *future* loss of housing units that *will* result from the conversion of residential hotel rooms to nonresidential use. In this sense they are prospective only, and are thus the functional equivalent of traditional injunctive remedies, not compensatory damages. (See *Cutler-Orosi Unified School Dist. v. Tulare County School etc. Authority* (1994) 31 Cal.App.4th 617, 629 [37 Cal.Rptr.2d 106] (*Cutler-Orosi Unified School Dist.*) [No duty to defend action to enforce federal voting rights act; "the equitable declaratory and injunctive remedies authorized by the Voting Rights Act as a means of enforcing its proscriptions are not the 'functional equivalent' of a form of monetary indemnification or recoupment which may be classified as 'damages.' Rather, such equitable remedies retain their traditional character as prospective and essentially prophylactic methods of preventing the future reoccurrence of past illegal actions."]; *Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 56 [70 Cal.Rptr.2d 118, 948 P.2d 909] (*Aerojet-General*) [Describing *AIU* as holding that duty to indemnify "is not narrowly confined to money that the insured must give under law as *compensation* to third parties, but may also include money that the insured must itself expend in equity in order to provide *relief of the same sort.*" (Italics added.)].)

Here an order compelling plaintiffs to provide replacement housing or pay in-lieu fees under section 41.10 would not compensate anyone for harm

already inflicted, e.g., by prior violations of the Ordinance. Its sole function would be to avert *future* harm from the *future* displacement of residents. Residents already displaced in violation of the Ordinance would receive nothing from plaintiffs' compliance with section 41.10. Their only means of redress would be to maintain their own causes of action for damages. Thus, while an order compelling compliance with section 41.10 might be "mitigative" in some broad societal sense, the mitigation would be prophylactic, not remedial, and thus outside the zone of coverage described in *AIU*.

Even if plaintiffs' argument were on sounder precedential footing we are extremely reluctant to extend *AIU*'s rationale to costs incurred as a condition of compliance with a regulatory permit requirement. An insured should not be encouraged to engage in regulated activity while foregoing a required permit, or failing to comply with its conditions, in the hope that the costs of any enforcement proceeding, and perhaps even the costs of compliance, can be shifted to a liability insurer as "mitigative" expenses. Land use regulators commonly condition permits for development on the developer's acquisition and dedication of property or rights, or the payment of some kind of "mitigation fee." We do not believe a developer purchases liability insurance in the expectation that his or her insurer will pay for the costs of resisting enforcement of such conditions—let alone of complying with them. To impose such an obligation would not only exceed the bounds of an insured's reasonable expectations, but would offend public policy by encouraging landowners and others to defy regulations in the expectation that the costs of litigation, if not of compliance, can be shifted, ultimately, to other policyholders. Such a regime goes far beyond anything contemplated by the Supreme Court in *AIU*. (See *Cutler-Orosi Unified School Dist. supra*, 31 Cal.App.4th 617, 630, review den. [noting "substantial public policy reasons" not to permit coverage of school districts' costs to comply with federal voting rights statutes]; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1267 [10 Cal.Rptr.2d 538, 833 P.2d 545] ["costs of disgorgement" under restitution order pursuant to Unfair Business Practices Act, Bus. & Prof. Code, § 17203, are not damages covered under liability insurance policy; alternative rule would mean that "a person found to have violated the act would simply shift the loss to his insurer and, in effect, retain the proceeds of his unlawful conduct"].)

Plaintiffs cite *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815 [88 Cal.Rptr.2d 366, 982 P.2d 229], as "additional conclusive authority that warrants determining this appeal in [plaintiffs'] favor." We see nothing of particular relevance in that case, which holds that damages for breach of contract can, depending on circumstances, fall within the coverage provisions of a comprehensive general liability policy. Plaintiffs contend that the

case confirms their functional approach to the question of what constitutes damages. As we have seen, however, such an approach does not help them. Even if the City had explicitly sued for an order compelling plaintiffs to comply with section 41.10, the mitigation contemplated by such an order would not be the functional equivalent of damages, would not fall within the rationale of *AIU*, and would not have placed defendants under a duty to defend the City's lawsuit.

## III.

### *Penalties.*

Plaintiffs also argue that the City's prayer for civil penalties triggered a duty to defend. They cite a provision of the Ordinance stating that "proceeds from the filing fees and civil fines assessed shall be used exclusively to cover the costs of investigation and enforcement of this ordinance." (Ord., § 41.8, subd. (e).) From this they argue that the penalties were "damages" under *AIU* because they would compensate the City for an injury to the "public fisc." (See *AIU*, *supra*, 51 Cal.3d at p. 829.)

The decision in *AIU* does not stand for the proposition that whenever a public agency seeks to recoup costs of enforcement, a judicial award embodying such recoupment constitutes damages for purposes of typical liability policies. To adopt such a blanket rule would result in an enormous private subsidy to finance regulatory enforcement litigation and would encourage, at least indirectly, noncompliance with all manner of regulation. The role of the "harm to public fisc" rationale in *AIU*'s overall reasoning is not entirely clear, but we are confident that the court did not intend to bring all government efforts to recoup enforcement costs within the coverage of comprehensive general liability policies.

In any event, we need not here determine the scope and effect of the "harm to public fisc" rationale because it surely cannot establish coverage of *penalties*. The court in *AIU* emphasized that the awards and expenditures at issue there were not punitive. (51 Cal.3d at p. 836.) The same cannot be said of the sums at issue here, which both the Ordinance and the City's complaint expressly describe as "penalties." Given that characterization and the absence of any attempt by plaintiffs to detract from its plain meaning and effect, public policy would not permit defendants to insure those sums. (See *id.* at p. 837, fn. 15, quoting Ins. Code, § 533.5 [" 'No policy of insurance shall provide, or be construed to provide, any coverage or indemnity for the payment of any fine, penalty, or restitution in any civil or criminal action or proceeding brought by the Attorney General, any district attorney, or any

city prosecutor . . . .' "] and Stats. 1988, ch. 489, § 3, p. 1897 ["stating that section 533.5 'does not constitute a change in, but is declaratory of, the existing law' "]; see also Ins. Code, § 533 [prohibiting insurance for liability resulting from wilful acts].)

IV.-IX.*

. . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Reardon, Acting P. J., and Hanlon, J.,† concurred.

---

*See footnote, *ante*, page 1435.

†Retired Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.